## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **THE HOME DEPOT, INC. and HOME DEPOT U.S.A., INC.,**<br><br>        **Plaintiffs,**<br><br>  **v.**<br><br>**VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL SERVICE ASSOCIATION, MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED,**<br><br>        **Defendants.** | **Civil Action No. _____**<br><br>**JURY DEMANDED** |

## COMPLAINT

1445310.1

*Of Counsel:*

Stephen R. Neuwirth*
stephenneuwirth@quinnemanuel.com
Steig D. Olson*
steigolson@quinnemanuel.com

**QUINN EMANUEL URQUHART
  & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor,
New York, New York  10010
Tel. (212) 849-7000
Fax (212) 849-7100

Alicia K. Cobb*
aliciacobb@quinnemanuel.com

**QUINN EMANUEL URQUHART
  & SULLIVAN, LLP**
600 University Street, Suite 2800
Seattle, Washington 98101
Tel. (206) 905-7000
Fax (206) 905-7100

*(\*Pro Hac Vice Applications to be filed)*

Frank M. Lowrey IV
Georgia Bar No. 410310
lowrey@bmelaw.com
Ronan P. Doherty
Georgia Bar No. 224885
doherty@bmelaw.com

**BONDURANT MIXSON &
  ELMORE, LLP**
3900 One Atlantic Center
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel. (404) 881-4100
Fax (404) 881-4111

1445310.1

Plaintiffs The Home Depot, Inc. and Home Depot U.S.A., Inc. (collectively, "The Home Depot") bring this action against Defendants Visa U.S.A. Inc. ("Visa U.S.A."), Visa International Service Association ("Visa International"), Visa Inc., (collectively with Visa U.S.A. and Visa International, "Visa"), MasterCard Incorporated, and MasterCard International Incorporated ("MasterCard International," collectively with MasterCard Incorporated, "MasterCard," and collectively with Visa "Defendants") under federal and state antitrust laws, as follows:

## <u>OVERVIEW</u>

1.      For years, Visa and MasterCard have been more concerned with protecting their own inflated profits and their dominant market positions than with the security of the payment cards used by American consumers and the health of the United States economy.  Visa and MasterCard have pushed consumers to use payment card technology that Visa and MasterCard know is defective and subject to fraud and have colluded with each other and with the banks that issue debit and credit cards to do so.  They have also unlawfully fixed at high levels the so-called "interchange" fees that merchants must pay when presented with debit or credit cards.  As a result of their conduct, United States consumers experience the highest

rates of payment card fraud in the world, and United States businesses are subject to the highest payment card related fees in the world.

2.      Visa and MasterCard have perpetuated this state of affairs because they have a dominant place in the market as it exists today, and the continuation of the status quo protects them from the genuine competition they fear.

3.      Credit and debit card fraud drain billions of dollars from the United States economy every year.  Visa, MasterCard, and their member banks that issue these cards are complicit in this damage to the American economy.  For decades, the technology has existed to make credit and debit card transactions safer and less prone to fraud.  Indeed, this technology — the use of Personal Identification Number ("PIN") verification along with "EMV" chips ("chip-and-PIN") — has been used widely throughout the world to great success.

4.      EMV chips have been used in Europe since the mid-1990s.  Unlike payment data stored on a magnetic stripe, which is static or unchanging, each transaction involving an EMV card creates a unique transaction code, which can never be used again.  For this reason, if a criminal were to obtain the transaction information from a particular point of sale from an EMV card, the information would be useless for making a counterfeit card.

1445310.1

5.      Counterfeit cards are, however, just one aspect of payment card fraud. Merchants also face fraud arising from lost or stolen cards or card information, including in so-called "card-not-present" transactions (such as internet purchases), and EMV chips alone do not prevent this type of fraud.  To address these other types of fraud, EMV chips must be combined with measures such as PIN authentication (*i.e*. chip-and-PIN), as they are in many countries around the world.

6.      Regulators, empirical studies, and even Visa and MasterCard agree that chip-and-PIN verification provides far greater security than signature authentication.  As Visa and MasterCard told the Australian Competition and Consumer Commission in a 2013 joint submission, "Requiring the use of a Personal Identification Number rather than permitting signature as a means of customer authentication for all, or almost all, transactions . . . is a proven method of reducing card fraud."

7.      Visa and MasterCard know perfectly well that a signature alone, without the additional step of requiring a PIN, provides virtually no protection against many types of payment card fraud.  While many consumers assume their signatures are verified in some manner, Visa and MasterCard actually do not require that signatures are verified and even *discourage* merchants from verifying signatures, for fear that consumers will be less likely to use their payment cards.

8.      As a result of Visa and MasterCard's conduct, as alleged herein, the proven method for reducing card fraud, chip-and-PIN technology, is not being used in the United States to a significant degree, even though it is widely used elsewhere around the world.  In fact, while U.S. consumers and merchants — like The Home Depot — bear costs related to fraud rates unrivaled in the rest of the industrial world, Visa, MasterCard, and their member banks have acted in concert to prevent the adoption of chip-and-PIN authentication in the United States on a large scale.  While chip-and-PIN authentication is proven to be more secure, it is less profitable for Visa, MasterCard, and their member banks, and it provides a greater threat to their market dominance.

9.      Visa and MasterCard have built highly profitable businesses that rest on preventing competition from rival PIN networks.  Going back many years, Visa and MasterCard have extracted hugely profitable fees from merchants by engaging in anticompetitive agreements between and among Visa and the Visa member banks, and MasterCard and the MasterCard member banks, to adopt, impose, and enforce a system of rules and practices that require the payment of an interchange fee on every transaction conducted through the Visa and MasterCard networks and to adopt, impose, and enforce the use of "default" levels of those fees.

10.     Rather than competing for merchant acceptance in a free market, Visa and MasterCard fix the interchange rates that merchants must pay for every transaction, and enforce rules that limit card issuer competition.  This long-standing price fixing, which continues today, is combined with various rules, including the so-called Honor All Issuers rules and other merchant restraints, described more fully below, that prevent competition for merchant acceptance among issuing banks and for transaction volume among networks.  These agreements artificially inflate the prices that The Home Depot and other merchants pay to accept Visa- and MasterCard-branded payment cards.

11.     Visa and MasterCard enforce their price-fixing agreements by mandating that all banks adhere to their network rules, monitoring transactions to identify member banks offering lower interchange fees in violation of Visa's and MasterCard's interchange rate rules, and subjecting any such banks to fines and even expulsion from the Visa and MasterCard networks.

12.     The major threat to Visa's and MasterCard's ability to maintain this highly profitable price-fixing regime comes from PIN networks, which offer merchants more routing options and lower fees and which offer both merchants and consumers greater security.  PIN technology arose in the context of ATM-machine networks, which eventually branched out beyond ATMs to provide debit

and cash-back services.  Cards utilizing PIN technology often had a number of

competing PIN networks all installed on the card, and these networks could

compete on price in order to win every transaction.  In fact, at one point, PIN

networks even charged *negative* prices to merchants to utilize their PIN

networks.

13.    But even with PIN networks offering low or even negative prices to

merchants, they have been unable to threaten Visa and MasterCard's market

dominance.  For years, Visa and MasterCard have successfully avoided having

banks issue credit cards allowing for PIN authorization, even though PIN

authorization is used for credit transactions in other countries and is more secure

for consumers and merchants.  In the United States, each credit card has only a

single network installed on a card.  The single-network-per-card structure in the

credit card market is not a coincidence — it is the result of explicit agreements

among Visa and MasterCard and the card-issuing banks.  These agreements and

rules, including those known as "no-multi-issuer rules," ensured that each Issuer

only enables a single network on each credit card.

14.    The issuing banks — the primary shareholders of Visa and

MasterCard — have little reason to resist Visa and MasterCard's attempts to limit

the use of PIN technology.  These banks profit from Visa and MasterCard's market power by charging supracompetitive interchange fees on signature transactions.

15.     As noted, because debit transactions arose from the ATM (or PIN-based) networks, debit cards often can have more than one network enabled on a card.  Yet Visa and MasterCard have perpetuated a regime in which there is a "signature" option on the front of a debit card (usually Visa or MasterCard), with the "PIN" options relegated to the back of the card.  The Home Depot and other major merchants generally prefer to route debit transactions over PIN networks so they can foster competition and have the benefit of lower PIN debit prices and more security.  Visa and MasterCard, however, have systematically worked together and with their member banks to prevent merchants from being able to take advantage of these options in a significant way.  For years, Visa or MasterCard would simply bribe the banks that issue debit cards to install *Visa or MasterCard itself* as the sole PIN option on the back of the card, using the inflated interchange fees they generated from their price fixing scheme.

16.     In July 2010, with the passage of the "Durbin Amendment," as discussed more fully below, Congress made an effort to bring more competition to the market and to address Visa's and MasterCard's ability to exercise substantial market power by raising interchange fees well above costs.  The Durbin

Amendment provided that one network (such as Visa) could not be both the signature debit option on the front of the card and the only PIN debit option on the back of the card.  It also capped the interchange fees that could be charged on many signature debit transactions.  As a result, the Durbin Amendment had the potential to introduce more competition from PIN-based networks and to limit the incentives of issuing banks to remain willing participants in the conspiracy to favor signature over PIN.

17.     But Visa and MasterCard responded by taking steps, including in direct coordination with each other, to prevent PIN competition from emerging even after this congressional action.  For example, Visa and MasterCard recently — in striking lockstep — announced they would punish Issuer Banks that even consider supporting PIN debit options by imposing massive new fees on them by fiat.  Visa announced that, starting in April 2016, it would impose a new 5 basis points fee, called a Delayed De-Conversion Assessment ("DDCA"), on any card issuer that indicated an intent to change its business status or network affiliation or that experienced a material decline in Visa payment volume.  MasterCard similarly announced it was radically increasing its so-called "volume assessment" fee to penalize card issuers when volume is processed over PIN debit networks.  These fees are nothing other than blatant efforts to prevent competition, and Visa and

1445310.1

MasterCard announced them in lockstep to make sure issuing banks know they face retribution for supporting PIN debit options.

18.     After complaints were raised by many in the industry about Visa's new DDCA, Senator Richard Durbin wrote to Visa expressing serious concern about Visa's effort to impose a "significant penalty on card issuers that try to shift their business from Visa to a competing card network or that see their business shifted to competing networks through market forces."  After receiving this letter, Visa has indicated it will not proceed with imposing the DDCA.  But it had already demonstrated its intention and ability to punish banks who would dare to threaten its market dominance.

19.     Visa has also imposed on merchants a new Fixed Acquirer Network Fee ("FANF"), discussed more fully below, which is a fixed up-front fee merchants must pay to participate in the Visa network and accept *any* Visa credit or debit cards.  A merchant can avoid this fee only by declining to accept any Visa products — which given Visa's market dominance is a rare occurrence.  But once a merchant has elected to accept any Visa products, that merchant can only mitigate the FANF by routing PIN debit transactions to Visa, rather than making a second payment to process a transaction over a rival PIN debit network.

20.     Visa and MasterCard have also worked closely together under the guise of introducing "chip" technology — while, in reality, conspiring to ensure their market dominance is not threatened and to maintain the status quo. Specifically, Visa and MasterCard met and coordinated their conduct as part of an entity they named "EMVCo" after Europay, MasterCard, and Visa, the companies that began meeting to develop security specifications in 1994.  Under the rubric of EMVCo, Visa and MasterCard established specifications favoring their own less secure chip-and-signature cards over more secure chip-and-PIN transactions.  Visa and MasterCard refused to prioritize PIN authentication despite requests from consumers, merchants, and regulators, and guidance from independent studies and think tanks.

21.     Defendants' resistance to the use of PIN authentication is not grounded in any technical, procompetitive, or legitimate justification.  For instance, when the *Wall Street Journal* asked a senior executive at MasterCard why they were not offering PIN authentication, he stated that "[s]ome consumers find it difficult to remember pins."  But consumers regularly remember passwords to access their mobile phones and ATM machines and for numerous other purposes.

22.     Similarly, the chief legal officer of Visa told the *Washington Post* that Visa did not want to "complicate matters by requiring everybody to adopt pin

everywhere." But adopting EMV standards of any kind introduces this type of "complication" and the burden of adding PIN at the same time would be minimal while making consumers' bank accounts far more secure.

23.     These justifications are pretextual — the true purpose for Defendants' joint efforts to favor chip-and-signature in the United States over chip-and-PIN is to protect Visa's and MasterCard's inflated profits that are tied to cards using the faulty signature technology. In short, signature processing permeates the United States market because Visa and MasterCard profit from this well-documented instrument of fraud.

24.     In fact, the new chip-and-signature standards have done little more than help Visa and MasterCard strengthen their hold over the credit and debit markets, to the detriment of merchants and consumers. Now, when customers insert a chip-based debit card into a new terminal, the EMV terminal specifications — established by Visa and MasterCard through EMVCo, and whose adoption is required in order for merchants to certify compliance with EMV — are designed stealthily to steer customers away from PIN options toward Visa's or MasterCard's signature debit products.

25.     Visa and MasterCard have also punished merchants that have attempted to steer customers towards lower-fraud and lower-cost PIN

networks.  Visa, for example, has taken the position that its rules require merchants to present signature authentication as an option for debit card transactions even when merchants would prefer to route debit transactions over PIN networks that offer better economic terms and greater safety than signature networks.

26.     As a result of Defendants' anticompetitive scheme to stifle PIN-based authentication and force merchants to accept signature credit cards and signature debit networks, Visa and MasterCard have continued to enjoy the supracompetitive profits generated by their interchange-fee price-fixing scheme and have grown their market share.  Their bank shareholders, too, have continued to reap outsized profits from the highest interchange and related card payment fees in the world.

27.     The Home Depot, on the other hand, has been forced to pay these inflated interchange fees while bearing direct and indirect effects of fraud arising from Defendants' dissemination of defective products.  The Home Depot is a large and sophisticated business and the nation's leading provider of building materials, home-improvement products, and lawn and garden products.  Yet while Defendants' interchange and related fees are one of The Home Depot's largest costs, these costs remain largely beyond The Home Depot's control as a result of Defendants' market power.

1445310.1

12

28.     As a direct result of Defendants' practices, which have occurred over many years and continue to the present day, The Home Depot and other U.S. merchants pay supracompetitive interchange and other related fees and also bear the costs of fraud, including Payment Card Industry ("PCI") compliance costs, fraud chargebacks, and other costs merchants incur to secure the defective products from compromise or use in an unauthorized manner.

29.     Accordingly, based on the anticompetitive conduct challenged herein, The Home Depot seeks treble damages and injunctive relief, as appropriate, under federal antitrust law and state laws.

## JURISDICTION AND VENUE

30.     This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and/or restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  The Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331 and 1337.

31.     This Court has supplemental jurisdiction over The Home Depot's state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to The Home Depot's claims within such original jurisdiction that they form part of the same case or controversy.

1445310.1

32.     This Court has personal jurisdiction over Defendants because, among other things, Defendants:  (a) transact business throughout the United States, including in this District; (b) have substantial contacts with the United States, including in this District; and/or (c) are engaged in an illegal anticompetitive scheme that is directed at and has the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

33.     Venue in this District is proper under 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22.  Defendants transact business and are found in this District.  In particular, tens of thousands of retail establishments located in this District, including a number of The Home Depot stores, accept Visa and MasterCard credit cards and debit cards.  Member banks of Visa and MasterCard located in this District issue Defendants' credit, debit, and store-value cards and/or acquire retail merchant transactions for Visa and MasterCard credit, debit, and store-value cards.  The interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District.  The acts complained of have had substantial anticompetitive effects in this District.

## DEFINITIONS

34.     The following terms are used in this Complaint:

(a)     "Acquirer" or "Acquiring Bank" means a bank or other financial institution that has been authorized by a General Purpose Payment Card Network to enter into agreements with merchants that enable those merchants to accept General Purpose Payment Cards for the purchase of goods and services.  Acquirers authorized by the Visa and MasterCard General Purpose Payment Card Networks to acquire Visa- and/or MasterCard-branded General Purpose Payment Card transactions are members or agents of those networks.

(b)     "Charge Card" (also referred to as "Travel and Entertainment Card" or "T&E Card") is a General Purpose Credit Card for which the cardholder is required, under most circumstances, to pay the card balance in full each month. Diners Club cards and traditional American Express Green, Gold, Platinum and Centurion (Black) cards without preset spending limits are examples of Charge Cards.

(c)     "Damages Period" means the time period over which The Home Depot is entitled to seek a damages award based on the anticompetitive conduct challenged herein, which as to MasterCard begins no earlier than August 2004, and as to Visa begins no earlier than January 2005.

(d)    "General Purpose Credit Card" means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing a line of credit extended to the cardholder by the Issuer.  Examples of General Purpose Credit Cards are the Visa and MasterCard personal consumer and corporate credit cards, the Discover credit card issued by Discover Financial Services, and the Optima and Blue-type credit cards issued by American Express.  General Purpose Credit Cards also include Charge Cards such as the traditional American Express card that require payment at the end of a billing cycle.

(e)    "General Purpose Credit Card Network Services" means the services and infrastructure that a network and its members provide to merchants through which payment transactions using General Purpose Credit Cards are conducted, including authorization, clearance, and settlement.

(f)    "General Purpose Debit Card" means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing an asset account, typically the cardholder's demand deposit account ("DDA"), at a bank or other financial institution.  Visa's Signature Debit Card program (the "Visa Check Card") and MasterCard's Signature Debit Card program (sometimes

referred to as "Debit MasterCard") are General Purpose Debit Cards, as are PIN

Debit Cards authorized over Visa's Interlink and MasterCard's Maestro networks.

General Purpose Debit Cards also include prepaid cards, which access asset

accounts other than the cardholder's DDA.  Examples include, but are not limited

to, payroll cards and cards associated with a flexible spending account, health

reimbursement arrangement, or health savings account.

(g)    "General Purpose Debit Card Network Services" means the services

and infrastructure that a network and its members provide to merchants through

which payment transactions using General Purpose Debit Cards are conducted,

including authorization, clearance, and settlement.

(h)    "General Purpose Payment Card" means a General Purpose Credit

Card or a General Purpose Debit Card.

(i)    "General Purpose Payment Card Network" means an electronic

payment system used to accept, transmit or process transactions made by General

Purpose Payment Cards for money, goods, or services, and to transfer information

and funds among Issuers, Acquirers, merchants and users of General Purpose

Payment Cards.  Both Visa and MasterCard operate General Purpose Payment

Card Networks.

(j)      "Honor All Issuers" rules are the "Honor All Cards" rules of Visa and MasterCard that require any merchant that accepts Visa- or MasterCard-branded General Purpose Credit Cards to accept all such General Purpose Credit Cards that carry the brand of that network, and the rules of Visa and MasterCard that require any merchant that accepts Visa- or MasterCard-branded General Purpose Debit Cards to accept all such General Purpose Debit Cards that carry the brand of the respective network.

(k)      "Interchange Fees" are fees or rates fixed by Visa or MasterCard and their member banks that are paid to Issuers by merchants in conjunction with transactions in which Visa or MasterCard General Purpose Payment Cards are used as a means of payment for purchases of goods and services.  Interchange Fees are deducted by an Issuer from the funds owed to a merchant prior to the settlement of a Visa or MasterCard General Purpose Payment Card transaction.

(l)      "Issuer" or "Issuing Bank" means a bank or other financial institution that issues General Purpose Payment Cards to consumers (including business employees) to pay for goods and services at merchant locations.  Issuers authorized by the Visa and MasterCard General Purpose Payment Card Networks to issue Visa- and/or MasterCard-branded General Purpose Payment Cards are members of those networks.

1445310.1

(m)   "PIN Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by swiping his or her card at the point-of-sale and entering a personal identification number ("PIN").  PIN Debit Card networks grew out of regional ATM networks and are processed differently than Signature Debit Card transactions.  Examples of PIN Debit Card networks include Discover's Pulse network, Visa's Interlink network, MasterCard's Maestro network, FIS's NYCE network, and First Data Corporation's STAR network.

(n)   "Premium Payment Card" means a General Purpose Credit Card that carries a higher Interchange Fee than standard General Purpose Credit Cards and is required by a network to provide a certain level of rewards or incentives to the cardholder.  The "Visa Signature Preferred Card" product and "World MasterCard Card" product are examples of Premium Payment Cards.

(o)   "Signature Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the point-of-sale and signing a receipt or point-of-sale terminal.  Signature Debit Card transactions are processed in the same way as General Purpose Credit Card transactions.  Examples of Signature Debit Cards include the Visa Check Card product and the Debit MasterCard product.

## THE PARTIES

35.     The Home Depot, Inc. and Home Depot U.S.A., Inc. (collectively, "The Home Depot") are both Delaware corporations with their principal places of business in Atlanta, Georgia.  The Home Depot accepts Visa and MasterCard credit and debit cards for payment in its stores and online, including at entities operating under the names The Home Depot, Home Decorators Collection, Home Depot Convenience, Red Beacon, Inc., THD At-Home Services, Inc., U.S. Home Systems, Inc., U.S. Remodelers, Inc., Home Depot Interiors, Home Depot Incentives, Inc., The Home Depot Special Services, Inc., Your Other Warehouse, LLC, BlackLocus, Inc., Blinds.com, and Interline Brands, Inc.  The Home Depot operates thousands of retail stores that accept Visa and MasterCard credit and debit cards for payment throughout the United States, including in this District.

36.     Until the corporate restructuring and IPO described below, Defendant Visa International operated as a non-stock nonassessable Delaware membership corporation with its principal place of business in Foster City, California.  Visa International's owner/members included approximately 21,000 banks.

37.     Prior to the corporate restructuring and IPO, Defendant Visa U.S.A. was a non-stock nonassessable Delaware membership corporation with its principal place of business in Foster City, California.  Visa U.S.A.'s

owner/members included approximately 14,000 banks.  Visa U.S.A. was a regional group member of Visa International.

38.     Prior to the Visa IPO, Visa International and Visa U.S.A. were each governed by a board of directors comprised of bank executives selected from their member banks.  Visa International also had regional boards of directors for each of its geographic regions.

39.     In 2007 and 2008, Visa U.S.A. and Visa International, in addition to other Visa entities not named as Defendants, conducted a number of corporate restructurings to combine several previously independent corporate entities into Defendant Visa Inc.  On March 19, 2008, Visa Inc. conducted an initial public offering through which it offered ownership shares to the general public and also issued ownership shares to its member banks.  As a result, Visa Inc. became and operates today as a publicly-traded Delaware corporation, with its principal place of business in Foster City, California.  Upon the restructuring, Visa U.S.A. and Visa International became wholly-owned subsidiaries of Visa Inc., and they continue to operate as such today.  Visa Inc., Visa U.S.A., and Visa International are collectively referred to herein as "Visa."

40.     Visa operates General Purpose Payment Card Networks, and did so throughout the Damages Period.

41.     Prior to the MasterCard IPO, Defendant MasterCard Incorporated was a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in Purchase, New York.  Defendant MasterCard International, a wholly-owned subsidiary of MasterCard Incorporated with its principal place of business also in Purchase, New York, was a Delaware membership corporation that, prior to the MasterCard IPO, consisted of more than 23,000 owner/member banks worldwide and was the principal operating subsidiary of MasterCard Incorporated.

42.     Prior to the MasterCard IPO, MasterCard Incorporated and MasterCard International were governed by a global board of directors, as well as regional boards of directors for each of their geographical regions, that were comprised of bank executives selected from their member banks.

43.     On May 25, 2006, MasterCard Incorporated and MasterCard International conducted an initial public offering and entered into several related agreements to offer ownership shares to the general public and to issue ownership shares to MasterCard's member banks.  As a result, MasterCard Incorporated became and operates today as a publicly-traded Delaware corporation with its principal place of business in Purchase, New York.  Upon the restructuring and continuing to this day, MasterCard International has remained MasterCard

Incorporated's principal operating subsidiary with its principal place of business also in Purchase, New York, and doing business as MasterCard Worldwide. MasterCard Incorporated and MasterCard International (and MasterCard Worldwide) are collectively referred to herein as "MasterCard."

44.     MasterCard operates General Purpose Payment Card Networks and did so throughout the Damages Period.

## CO-CONSPIRATORS

45.     Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of the conspiracies.  As more fully discussed herein, the co-conspirators include, but are not limited to, the following:  (a) Issuing Banks (or Issuers) that have issued Visa and MasterCard payment cards and have agreed to set, fix, and enforce, through anticompetitive rules and restraints, Visa and MasterCard Interchange Fees; (b) Acquiring Banks (or Acquirers) who acquire Visa and MasterCard transactions from The Home Depot and other merchants and who agreed to and have imposed the anticompetitive rules and restraints on The Home Depot and other merchants; and (c) banks that have or had membership on Visa's or MasterCard's board of directors and specifically adopted and agreed to impose

the challenged rules and restraints upon The Home Depot and other merchants.
These banks are referred to as "member banks" in this Complaint.

46.     An Issuing Bank is a member of Visa or MasterCard that issues
payment cards to consumers for use as a payment device.  Issuing Banks are
horizontal competitors.

47.     Each Issuing Bank is a separate economic actor expected to pursue
independent economic interests.  In other aspects of their businesses, Issuing Banks
compete against one another.  For example, they can compete for cardholders by
creating payment card products that offer an array of interest rates, annual fees,
purchase rewards, and other features that will make their cards more attractive than
those offered by other Issuing Banks.  As the district court found in *United States
v. Visa U.S.A., Inc., Visa International Corp., and MasterCard International
Incorporated*, cardholders "can choose from thousands of different card products
with varying terms and features, including a wide variety of rewards and co-
branding programs and services such as automobile insurance, travel and
reservation services, emergency medical services and purchase security/extended
protections programs."  163 F. Supp. 2d 322, 334 (S.D.N.Y. 2001).

48.     As a result of the conduct challenged herein, however, Issuers do not
compete for merchant acceptance of the cards they issue.  Instead, by continuing to

agree to and adhere to the anticompetitive restraints and default Interchange Fees, Issuers have deprived the marketplace of independent centers of decision-making and, therefore, actual and potential competition.

49.     Merchants, including The Home Depot, purchase credit and debit card network services from Visa and MasterCard through the Visa and MasterCard networks' Acquiring Bank members.  All Acquiring Banks are members of Visa and MasterCard, acquire payment transactions from merchants, and enforce agreed-upon association rules, regulations, restraints, and fee structures.  As member banks, Acquirers act as gatekeepers, ensuring that card transactions are routed over the Visa and MasterCard networks, that Interchange Fees set by the networks are paid on all transactions, and that merchants abide by the networks' rules.  Both before and after the Visa and MasterCard corporate restructurings, association rules guarantee that the member banks are involved in every step of a payment card transaction.  Subject to the anticompetitive restrictions and practices alleged herein, Acquiring Banks are horizontal competitors.

50.     Acquiring Banks are participants in a conspiracy with each other, with Issuing Banks, and with Visa and MasterCard to set, fix, and enforce Interchange Fees at supracompetitive levels and impose restrictive and anticompetitive rules on merchants, including The Home Depot — practices that prevent merchants from

using the price mechanism and price competition to drive interchange rates down to the competitive level that would exist in the absence of the anticompetitive rules.

51.     Acquirers and Issuers have had actual knowledge of and have knowingly participated in the conspiracy to collectively-set Interchange Fees and then enforce those Interchange Fees by imposing restrictive rules upon The Home Depot and other merchants.

## FACTUAL ALLEGATIONS

**A.     Defendants' Cartels**

52.     Defendants created and maintain two cartels that implemented their agreements to fix prices, to avoid competition, and to protect their market power. One conspiracy was perpetrated by Visa and its member banks; the other was perpetrated by MasterCard and its member banks.  Both conspiracies are ongoing.

53.     One pillar of each of these conspiracies is Visa's and MasterCard's Honor All Issuers rules.  Pursuant to these rules, each network's member/owner banks have agreed that any merchant that accepts any one bank's General Purpose Credit (or Debit) Cards issued over that network must accept all other banks' General Purpose Credit (or Debit) Cards that carry the brand of that network.

These "all or nothing" rules constitute agreements among the banks not to compete for merchants' acceptance of their General Purpose Credit (or Debit) Cards.

54.     To reinforce their agreements not to compete for merchant acceptance, each network's Issuers have colluded to fix the Interchange Fees they charge The Home Depot and other merchants on every transaction through the default Interchange Fee rules.  This collusive practice has prevented The Home Depot and other merchants from realizing the price-reducing benefits of Issuers competing on price, which would have occurred in a competitive market.  Instead, merchants accepting either Visa or MasterCard General Purpose Payment Cards pay the same Interchange Fee on a given transaction regardless of which Issuer is involved.  There is no competition.  Within each conspiracy, Issuers charge merchants exactly the same inflated prices that are the products of the banks' collusion.  These banks typically compete for cardholders, but they do not compete for merchant acceptance or over the Interchange Fees that merchants must pay to accept their Visa and MasterCard cards.

55.     Visa and MasterCard are the enterprises by which competing banks implement and effectuate their agreements not to compete and agreements to fix prices.  These schemes rely on rules — such as the Honor All Issuers rules, default Interchange Fee rules, and other rules and policies that establish mechanisms for

monitoring and enforcing these price-fixing schemes — that bind all Visa and MasterCard Issuers and Acquirers.

56.     In addition to inflicting direct financial harm on The Home Depot and other merchants with these price-fixing conspiracies, Defendants also have used these rules and policies to acquire and maintain their substantial market power. Specifically, Visa and MasterCard used these supracompetitive Interchange Fees as an incentive for Issuers (who receive the Interchange Fees paid by merchants) to issue Visa and MasterCard General Purpose Payment Cards. Using price fixing to induce Issuers to join their cartels, Visa and MasterCard acquired sufficient market power in the General Purpose Payment Card markets such that most merchants were compelled to accept their cards for payment.

57.     Moreover, once a merchant started accepting Visa's and MasterCard's General Purpose Payment Cards for payment, it was impossible to stop accepting them, and the merchants had to accept these cards on Visa's and MasterCard's terms — consistently routing the transactions using signature authentication. Once Visa and MasterCard acquired substantial market power over merchants, they maintained it by forcing merchants to pay ever higher Interchange Fees on these signature transactions, to continue to fund these price-fixing schemes and thereby maintain and enhance their cartels' market power through the present day.

58.     Although Visa and MasterCard initially focused their anticompetitive conduct on General Purpose Credit Cards, once they achieved substantial market power in the General Purpose Credit Card market they leveraged it to achieve substantial market power in the General Purpose Debit Card market by forcing merchants to accept Defendants' Signature Debit Card transactions as a condition of accepting Defendants' dominant General Purpose Credit Card transactions and by engaging in a variety of other exclusionary conduct.

59.     As the natural and intended consequences of their anticompetitive conduct, Defendants set both General Purpose Credit Card and Debit Card Interchange Fees at supracompetitive levels — fees paid by merchants and their customers.  Merchants continue to pay these fees to this day.

60.     Defendants' anticompetitive conduct was not reasonably necessary to operate their General Purpose Payment Card Networks.  Domestic and international examples demonstrate that Interchange Fees are economically unnecessary to incentivize Issuers to issue General Purpose Payment Cards or for payment systems to function.  *A fortiori*, Issuers' collusively-fixed, supracompetitive Interchange Fees are unjustifiable.

### 1.   Visa and MasterCard facilitated horizontal conspiracies of their member banks.

61.   As owners of Visa and MasterCard, and as board members and participants in key operating committees of pre-IPO Visa and MasterCard, the member banks conspired to control every aspect of Visa's and MasterCard's business.  Such collective control was used to implement the member banks' agreements not to compete for merchant acceptance of General Purpose Payment Cards, and the associated agreements to fix the prices of Interchange Fees for Visa and MasterCard General Purpose Payment Card transactions.  The member banks ratified the default Interchange Fee schedules that were recommended by staff and consultants of Visa and MasterCard.  The conspiracies broadened as more banks joined Visa and MasterCard and agreed to abide by agreements not to compete and to fix prices.  The conspiracies also broadened during that time period when the banks added new high-Interchange Fee products — such as the Visa Signature and Signature Preferred Cards and the World and World Elite MasterCard Cards — to the universe of Visa and MasterCard products that were subject to the conspiracies.

62.   In a decision affirming the condemnation of other exclusionary rules of Visa and MasterCard, the Second Circuit held in 2003 that Visa and MasterCard:

> are not single entities; they are consortiums of competitors.  They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions.  These 20,000 banks set the policies of Visa U.S.A. and MasterCard.  These competitors have agreed to abide by a restrictive exclusivity provision. . . . *The restrictive provision is a horizontal restraint adopted by 20,000 competitors.*

*United States v. Visa U.S.A., Inc., Visa Int'l Corp., & MasterCard Int'l Corp.*, 344 F.3d 229, 242 (2d Cir. 2003) (emphasis added).  Like those restrictive provisions to which the member banks agreed in their capacities, *inter alia*, as board members and/or owners of Visa and MasterCard, the anticompetitive conduct by Visa and MasterCard establishing the agreements not to compete and price-fixing schemes were the products of conspiracies among competing Issuers — conspiracies that continue to this day.

### 2.    The Honor All Issuers rules constituted unjustifiable horizontal agreements not to compete on price.

63.    In order to eliminate any incentive for Issuers to compete for merchant acceptance based on the price of interchange, as they would have done in a competitive market, the member banks on Visa's and MasterCard's governing boards of directors approved the Honor All Issuers rules.  *See, e.g.*, Visa Rule 5.2.B, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); MasterCard Rule 5.6.1, *MasterCard Rules* (Feb. 2008).  The rules

1445310.1

31

require a merchant to accept *all* of a network's Issuers' General Purpose Credit (or all Debit) Cards bearing the network's brand if that merchant wants to accept any single Issuer's General Purpose Credit (or Debit) Cards bearing the network's brand, regardless of the Issuer.  These rules also prohibit merchants from practices steering consumers from using one Issuer's Visa or MasterCard General Purpose Payment Cards to using General Purpose Payment Cards issued by other Issuers or other cheaper forms of payment.

64.     These "all or nothing" rules support Defendants' cartels in the following manner.  By forcing a merchant to accept all General Purpose Credit (or Debit) Cards bearing the network's brand, while barring merchants from steering by Issuer, Issuers need not worry about losing business to a lower-cost competitor because all cards issued by every Issuer must be accepted at the default Interchange Fee rates.  Thus, a merchant that accepts cheaper Visa (or MasterCard) standard General Purpose Credit Cards, for which the merchant would pay substantially lower, but still supracompetitive Interchange Fees, must also accept a Visa Signature Preferred Card transaction, which bears a higher Interchange Fee. Because of the Honor All Issuers rules, Issuers have no incentive to enter into bilateral agreements outside the conspiracy, *i.e.*, Issuers are incentivized not to

"cheat" on the price-fixing scheme.  Thus, the default Interchange Fees have become a price floor.

65.    If there had been no Honor All Issuers rules, it would have been in the economic interest of an individual, profit-maximizing Issuer to lower the price it charged in order to compete for merchants' business against other banks issuing similar General Purpose Payment Cards.  These "all or nothing" rules, however, eliminated the incentives to engage in such competition and to lower prices below the anticompetitive, cartel-determined levels set forth in the default Interchange Fee schedule.  With the Honor All Issuers rules in place, it does not make economic sense for any Issuer to compete on price because merchants are forced to accept that Issuer's cards even though they are being charged inflated prices fixed by the cartels.  Because of these rules, Issuers have rebuffed overtures from merchants to enter into direct arrangements that would have benefited the Issuer.

66.    The Home Depot has made efforts to get the banks to compete for its business, but because of the impact of these rules, The Home Depot's efforts have been unsuccessful.

67.    Visa and MasterCard have argued that the Honor All Issuers rules are necessary to assure universal acceptance of their General Purpose Payment Cards. Their own conduct, however, reveals the pretextual nature of that justification.

Visa and MasterCard have permitted numerous products that function at only a subset of the locations that accept Visa and MasterCard General Purpose Credit (or Debit) Cards, and the introduction and proliferation of those products have not harmed the operation of their networks.  These include selective-acceptance (or selective-authorization) cards, which can be used only at certain merchant locations, even though they bear the Visa or MasterCard logos that supposedly connote universal acceptance of all the Visa or MasterCard brands' cards. Examples include the increasingly-prominent flexible spending account cards and health reimbursement account cards, among others.

68.     In addition, more recently, Visa and Chase entered an arrangement that purports to provide merchants the ability to prefer Chase-issued Visa General Purpose Payment Cards over other Visa General Purpose Payment Cards in certain limited circumstances.  These examples, among others, show that the Honor All Issuers rules are not necessary for a General Purpose Payment Card Network to function.  Moreover, even if the Honor All Issuers rules have some legitimate rationale, those objectives could be realized through less restrictive means.

**3.     The default Interchange Fee rules are unlawful horizontal agreements on price.**

69.     The default Interchange Fee rules are the mechanisms Defendants use to fix the prices of Interchange Fees.  Both Visa and MasterCard require that a

default Interchange Fee apply to every transaction for which the Issuer and
Acquirer has not entered into a separate, individually-negotiated agreement
regarding fees (*i.e.*, bilateral agreement). *See, e.g.*, Visa Rule 9.5, *Visa U.S.A. Inc.
Operating Regulations, Volume I—General Rules* (Nov. 15, 2008) ("These
Interchange Reimbursement Fees apply in all circumstances where Members have
not set their own financial terms for the Interchange . . ."); MasterCard Rule 9.4,
*MasterCard Rules* (Feb. 2008) ("The Corporation has the right to establish default
interchange fees . . . it being understood that all such fees set by the Corporation
apply only if there is no applicable bilateral interchange fee . . . agreement. . . .
Unless an applicable bilateral interchange fee . . . agreement . . . is in place, any
intraregional or interregional fees established by the Corporation are binding on all
Members.").  These rules underpinned the Interchange Fee schedules, which
applied to Visa and MasterCard transactions.

70.     While competition would have motivated rival Issuers to charge lower
fees than the default Interchange Fees, they have not done so because the Honor
All Issuers rules, working in tandem with the default Interchange Fee rules,
eliminated any incentive for Issuers to charge fees below the anticompetitively
high levels being fixed by the conspiracies.  As a result, member banks have rarely,
if ever, entered into bilateral agreements with merchants.

71.     In order to identify any cartel members "cheating" by secretly offering lower Interchange Fees, Visa and MasterCard monitored each transaction to ensure application of the appropriate Interchange Fee.  At the same time, Visa's and MasterCard's rules required all Issuers and Acquirers to adhere to all network rules.  *See, e.g.*, Visa Rule 1.2.A, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008) ("A Member must . . . comply with all of the following . . ."); MasterCard Rule 1.5.5, *MasterCard Rules* (Feb. 2008).  Member banks that violated any of these network rules were subject to fines and even expulsion from Visa and MasterCard and, by rule, the networks could not be held liable by these banks.  *See, e.g.*, Visa Rule 1.7, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); MasterCard Rule 3.1, *MasterCard Rules* (Feb. 2008).  This enabled Visa and MasterCard to monitor compliance with, and enforce, the rules of their respective cartels.  These rules remain in place to this day.

72.     All Issuers used the same default Interchange Fee schedules for any given Visa and MasterCard payment transaction but, within each of those schedules, there was wide variability in the fees charged for various transactions.  For example, a schedule of default Interchange Fees set different fee levels for different card types (*e.g.*, standard General Purpose Credit Cards versus Premium

Payment Cards).  This schedule of default Interchange Fees also imposed different fee levels by merchant category, with card-not-present merchants (merchants that sell goods and services to consumers without face-to-face interaction, *i.e.*, typically over the Internet or by telephone or mail-order) paying substantially higher rates and with supermarkets and warehouse clubs paying comparatively low rates.  This price discrimination evidenced Visa's and MasterCard's substantial market power. While there were different fees within a given default Interchange Fee schedule, every Issuer applied the same fee schedule to a given transaction.  It is this collusion by every Issuer to set identical default Interchange Fee schedules that constitutes price fixing.

### 4.    Merchants pay Interchange Fees directly.

73.    The Home Depot pays Interchange Fees to an Issuer in connection with each retail transaction in which the Issuer's card is used as the method of payment.

74.    To avoid antitrust liability, Visa and MasterCard have advanced the fiction that Acquiring Banks are actually the entities that pay Interchange Fees, and those banks then purportedly "pass through" the Interchange Fees to merchants to varying degrees.  In reality, when a merchant accepts a Visa or MasterCard General Purpose Payment Card as payment for a transaction, that merchant directly

pays the Interchange Fees associated with that transaction.  The Issuer directly

deducts the Interchange Fee from the net transaction amount passed through to the

merchant before even sending the purchase amount to the Acquiring Bank.

Accordingly, Issuers account for Interchange Fees as revenue, and merchants

account for Interchange Fees as an expense.  In contrast, Acquirers do not account

for Interchange Fees as an expense.

### 5. Defendants have used their price-fixing schemes to establish, maintain, and enhance their long-held market power.

75.    Using price fixing to induce Issuers to join their price-fixing cartels,

Visa and MasterCard acquired substantial market power in the General Purpose

Payment Card markets, as courts have repeatedly determined.  For example, in

*United States v. Visa U.S.A. Inc., Visa International Corp. and MasterCard*

*International Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), the court determined that

"[b]ecause Visa and MasterCard have large shares in a *highly* concentrated market

with significant barriers to entry, both defendants have market power in the general

purpose card network services market, whether measured jointly or separately;

furthermore plaintiff has demonstrated that both Visa and MasterCard have raised

prices and restricted output without losing merchant customers."  *Id.* at 342.

76.    The United States "prove[d] through the testimony of merchants that they cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them." *Id.* at 340.  The Second Circuit affirmed this determination of market power, holding that "Visa U.S.A. and MasterCard, jointly and separately, have power within the market for network services." *United States v. Visa U.S.A. Inc., et al.*, 344 F.3d at 239.

77.    Visa's and MasterCard's substantial market power remains intact today.  In a Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and MasterCard in *United States v. American Express Company*, No. 10-cv-4496-NGG-RER, Dkt. No. 5 (E.D.N.Y. Oct. 4, 2010), the United States Department of Justice Antitrust Division ("Antitrust Division") alleged that Visa and MasterCard possessed market power in the "network services market" for General Purpose Cards (*i.e.*, general purpose credit and charge cards).  *Id.* at 6. The non-discrimination restraints at issue in that case prevented merchants from "reducing [their] purchases of one network's services by encouraging [their] customers to choose a competing network's General Purpose Card." *Id.* at 7.

78.     Although a merchant could theoretically resist high acceptance fees by no longer accepting Visa's or MasterCard's General Purpose Cards, the Antitrust Division recognized that the "all-or-nothing choice d[id] not effectively constrain Defendants' market power because merchants cannot refuse to accept these General Purpose Cards without alienating customers and losing significant sales." *Id.*

79.     These determinations that Visa and MasterCard possessed substantial market power are supported by direct evidence of that power.  That evidence includes:  (1) Visa's and MasterCard's ability to raise Interchange Fees without the loss of merchant acceptance or transaction volume; (2) successful price discrimination such as the price discrimination described above; (3) setting Interchange Fees unrelated to costs; (4) the ability to enforce anticompetitive policies; and (5) forcing merchants and consumers to accept inferior and defective products — including products that are susceptible to fraud.

(a)     *Ability to raise Interchange Fees with impunity*

(i)     *Visa*

80.     Starting in the 1970s, Visa has possessed and exercised substantial market power in the General Purpose Credit Card Network Services market, and that market power has increased significantly since then.  By the 1990s, Visa

General Purpose Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting Visa General Purpose Credit Cards became a competitive necessity for the vast majority of merchants, especially for card-not-present merchants that were heavily reliant on accepting such cards remotely.

81.    In the General Purpose Credit Card Network Services market, Visa raised General Purpose Credit Card Interchange Fees without merchants ceasing to accept Visa's General Purpose Credit Cards.  In fact, Visa typically gained volume after these increases.  For example, Visa permitted Issuers to reclassify standard Visa General Purpose Credit Cards as Premium Payment Cards.  Issuers responded by converting large portions of their outstanding cards to Signature and World cards, with corresponding higher Interchange Fees, and, at the flip of a switch, the Interchange Fees that The Home Depot and other merchants paid for transactions made with such cards increased dramatically.

82.    Notwithstanding the vigorous merchant opposition to these punitive price increases, few, if any merchants dropped Visa as a result.  In *United States v. Visa U.S.A. Inc.*, the district court found that the networks had market power because they "raised interchange rates charged to merchants a number of times, without losing a single merchant customer as a result."  163 F. Supp. 2d at 340.

The court further concluded that "even a cursory examination of the . . . network market reveals that whether considered jointly or separately, [Visa and MasterCard] have market power." *Id.* at 341. Visa and MasterCard collectively accounted for over 73% of transaction volume of General Purpose Payment Cards in the United States. *Id.*

83.     Visa continues to possess by far the highest market shares and the highest number of General Purpose Credit Cards in circulation. Accordingly, most merchants must accept Visa General Purpose Credit Cards to remain viable.

84.     At or around the beginning of the Damages Period, Visa raised its Signature Debit Card Interchange Fees, and then exercised its monopoly power to increase PIN Debit Card Interchange Fees as well. Notwithstanding these price increases, Visa's debit volumes have increased during the Damages Period. As with General Purpose Credit Cards, merchants could not drop Visa's Signature Debit or PIN Debit products despite these significant price increases. Visa's ability to increase Interchange Fees without losing merchant acceptance or transaction volume directly evidences its monopoly power in the General Purpose Debit Card market.

85.     Visa's monopoly power in the General Purpose Debit Card market and the supracompetitive nature of General Purpose Debit Card Interchange Fees

were confirmed by the passage by Congress of Section 1075 of the Dodd-Frank

Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat.

1376, 2068-74 (July 21, 2010) (the "Durbin Amendment"), which required the

Board of Governors of the Federal Reserve System (the "Federal Reserve") to

enact regulations to ensure that General Purpose Debit Card Interchange Fees for

covered Issuers (*i.e.*, banks with more than $10 billion in assets) are "reasonable

and proportional" to Issuer costs.  Section 920(a)(2) of the Electronic Fund

Transfer Act, 15 U.S.C. § 1693o-2(a)(2).

86.    In passing the Durbin Amendment, Congress made clear that the

statute was designed to address Visa's and MasterCard's ability to exercise

substantial market power by raising Interchange Fees well above costs.  Its

principal author, Senator Richard J. Durbin, made numerous statements to that

effect on the floor of the Senate, including the following:

> For years, Visa and MasterCard, and their big bank backers, have
> unilaterally fixed prices on the fees small businesses pay every time
> they accept a debit card from a customer.  The two giant card
> networks control 80 percent of the debit card market — that is Visa
> and MasterCard.  And it is no surprise that debit interchange fees have
> risen, even as the price of processing the transaction has fallen. . . .
> Finally, Visa, MasterCard, and the Wall Street banks will face some
> check against their unbridled market power in the credit and debit
> industries.

156 Cong. Rec. S5,802-03 (daily ed. July 14, 2010).  Even though the Federal

Reserve found that most Issuers' costs were slightly above "par" (*i.e.*, zero), to

implement the Durbin Amendment it capped both Signature and PIN Debit

Interchange Fees at $0.21 plus .05% plus an additional $0.01 fraud-prevention

adjustment.  *See Regulation II, Debit Card Interchange Fees and Routing, Final*

*Rule*, 76 Fed. Reg. 43,394, 43,472 (July 20, 2011) (setting the cap at "21 cents and

5 basis points for the value of the transaction"); *Regulation II, Debit Card*

*Interchange Fees and Routing, Final Rule*, 77 Fed. Reg. 46,258, 46,280 (Aug. 3,

2012) (adding the fraud-prevention adjustment).  This cap, while significantly

above cost for most Issuers, substantially reduced the debit Interchange Fees that

prevailed for years due to Visa's dominance of this market.

### *(ii)    MasterCard*

87.     MasterCard also has possessed and exercised substantial market

power in the General Purpose Credit Card Network Services market since the

1970s, and MasterCard's market power also has increased significantly over the

years.  By the 1990s, MasterCard General Purpose Credit Cards became the

primary or only such cards for tens of millions of consumers in the United States.

Accepting MasterCard General Purpose Credit Cards became a competitive

necessity for the vast majority of merchants, especially for card-not-present

merchants that were heavily reliant on accepting such cards remotely.

88.     Like Visa, MasterCard has continually raised the Interchange Fes that

merchants pay for accepting MasterCard General Purpose Credit Cards without

losing merchant acceptance.  Like Visa, MasterCard permitted Issuers to reclassify

standard MasterCard General Purpose Credit Cards as Premium Payment Cards

and, at the flip of a switch, the Interchange Fees that merchants paid for

transactions made with such cards increased dramatically.  Notwithstanding the

vigorous merchant opposition to these punitive price increases, few, if any

merchants, dropped MasterCard as a result.  Once a merchant begins to accept

MasterCard (and Visa) General Purpose Credit Cards, it is virtually impossible for

it to stop, and few, if any merchants have.

89.     MasterCard's substantial market power was further evidenced by its

ability to successfully charge merchants higher Interchange Fees than Visa

charged, even though MasterCard had lower market shares.  Throughout the

Damages Period, MasterCard fixed Interchange Fees that were higher than Visa's.

MasterCard designed this strategy to compensate for its self-perceived inferiority

to Visa in other dimensions that could make MasterCard less attractive to Issuers

absent the higher Interchange Fees.  If it did not have substantial individual market

power over merchants, MasterCard could not have consistently and profitably maintained higher Interchange Fees than Visa, a competing network.

(b)    Price discrimination

90.    As one court has held, Visa's and MasterCard's "ability to price discriminate also illustrates their market power.  Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards. . . .  Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than 'brick-and-mortar' merchants.  [Visa and MasterCard] rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet merchant, not Visa/MasterCard or their member banks, bears virtually all the risk of loss from fraudulent transactions." *United States v. Visa U.S.A. Inc., et al.*, 163 F. Supp. 2d at 340-41.

91.    This price discrimination continues today.  Both Visa and MasterCard establish separate Interchange Fees for each merchant category, for each of the networks' card products (credit, signature-debit, PIN-debit, and commercial), and for an individual merchant's acceptance volume.  Thus, two transactions conducted with the same Visa or MasterCard payment card could have vastly different

Interchange Fee rates based upon the size or type of merchant that accepted the card.  At the time of that 2001 *Visa U.S.A.* decision, Visa had twenty-one separate interchange categories, while MasterCard had nineteen.  By 2011, Visa had 104 separate interchange categories, while MasterCard had 275.

(c)     *Setting supracompetitive prices unrelated to cost*

92.     Visa and MasterCard did not set Interchange Fees based upon cost, as they would have done in a competitive market.  For example, with respect to the General Purpose Debit Card market, as noted above, the Federal Reserve found in 2011 that Visa's and MasterCard's Signature Debit and PIN Debit Card rates were substantially above cost.

93.     Rather than being tied to costs, the networks set Interchange Fees for each merchant segment based upon that segment's elasticity of demand — *i.e.*, the degree to which merchants in that segment "must take" their cards.  MasterCard's U.S.-based Associate General Counsel testified before the European Commission that MasterCard performed cost studies "to answer the question:  'How high could interchange fees go before we would start having either serious acceptance problems . . . [or] surcharging or discounting for cash."  European Commission Decision, COMP/34.579, ¶ 175 (Dec. 19, 2007).  He testified that the MasterCard interchange fees there were "not designed to allocate costs," but instead were an

attempt to "estimate the merchants' willingness to pay for a MasterCard card." *Id.* at 56 n.203 & n.204.  Visa's and MasterCard's ability to succeed in this conduct and profit from it is additional direct evidence of their substantial market power.

(d)     *Enforcement of anticompetitive rules and policies*

94.     Visa's and MasterCard's successful enforcement of anticompetitive rules and policies that harmed merchants without losing merchant acceptance or transaction volume further demonstrates the substantial market power that Visa and MasterCard had in the General Purpose Payment Card markets.

95.     The Honor All Issuers rules require that any merchant that accepts Visa or MasterCard must accept *all cards* of that brand, regardless of the Issuer or level of Interchange Fee.  Visa's and MasterCard's anti-steering rules also prevent any erosion of Visa's and MasterCard's market power.  By preventing merchants from influencing consumer choice, the anti-steering restraints prevent merchants from reducing the amount of Visa's and MasterCard's network services they purchased based on price.

96.     Despite the adverse economic impact of these rules and policies on merchants, given Visa's and MasterCard's substantial market power, merchants could not afford to stop accepting Visa or MasterCard transactions.

>    *(e)    Forcing merchants and consumers to accept defective
>           products*

97.    Throughout the Damages Period, Visa and MasterCard have acted to keep a defective product in place — signature-authenticated cards — in order to maintain their supracompetitive profits that are tethered to this faulty technology. Visa's and MasterCard's success in forcing merchants and consumers to accept and use technologically-inferior, and in fact defective, products — including products that Visa and MasterCard knew would increase fraud — is further evidence of their substantial market power.

98.    Visa and MasterCard coordinated their conduct by meeting regularly under the guise of standard setting and specifically under the rubric of an entity called EMVCo.  While Visa and MasterCard hold EMVCo out as a bona fide standard setting body, in fact it is a vehicle by which they have worked together to maintain their market dominance and to squash competition from rival PIN networks.

99.    Visa and MasterCard also coordinated their conduct by using Issuing Banks as a conduit for relaying strategic information from one network to the other.

100.    Visa and MasterCard could have dramatically reduced General Purpose Payment Card fraud in the United States by adopting new card technology

1445310.1

49

to replace the decades-old, fraud-prone "magnetic stripe" and signature-authenticated cards that they forced merchants and consumers to accept and use. But Visa and MasterCard have maintained the signature-based authentication system, and resisted superior technology, because they profit from the system that comes with this fraud-producing product.

101.   Visa and MasterCard have long recognized that the magnetic stripe technology that their General Purpose Credit Card and Signature Debit Card networks utilize is inherently insecure and fraud-prone.  Indeed, the data on a magnetic stripe can be easily copied (skimmed) with a simple card reading device, which enables criminals to reproduce counterfeit cards or engage in other forms of fraud, such as card-not-present fraud, which involves the unauthorized use of a credit or debit card outside of a face-to-face interaction with a merchant, such as in e-commerce.  Yet Visa and MasterCard perpetuated the use of magnetic stripe technology and delayed taking steps to implement more secure technologies.

102.   As a result, the United States has experienced the highest fraud rates in the world, and the gap continues to grow.  For example, the United States was not among the top ten countries with the most counterfeit fraud in 2004 but, by early 2010, it accounted for 85% of total counterfeit fraud among all top ten countries combined.  *See Counterfeit Fraud Migration*, European Payments

Council (June 29-30, 2010) at 5-7.  Indeed, Business Intelligence research service found that payment card fraud in the United States increased in 2013 by 29% to $7.1 billion, accounting for 51% of total worldwide card fraud (despite accounting for only about 25% of global payment card volume).

103.   Such extreme levels of payment card fraud can be avoided with the proper use and deployment of chip technology, which Visa and MasterCard declined to introduce in the United States until very recently, in combination with PIN verification features.  Instead of implementing these steps, however, Visa and MasterCard succeeded in shifting most of the cost of fraud losses to merchants in this country through the implementation of various compliance programs and liability rules.  They did so because they and their member banks profit from fraud which creates a pretextual justification for high Interchange Fees.  Visa and MasterCard also profited from fraud through punitive fines and fees for data breaches, another manifestation of their substantial market power.

104.   The technology to reduce fraud dramatically is available to Visa and MasterCard.  EMV chips have been used in Europe since the mid-1990s.  Unlike payment data stored on a magnetic stripe, which is static or unchanging, each transaction involving an EMV card creates a unique transaction code, which can never be used again.

105.   For this reason, if a criminal were to obtain the transaction information from a particular point of sale from an EMV card, the information would be useless, making counterfeiting EMV cards less fruitful, and leading to a decrease in fraud.  Indeed, after the UK implemented EMV chip payment technology in 2004, the UK reported a 55% reduction in counterfeit fraud and a 33% reduction in lost or stolen card fraud from 2005 to 2013.  Similarly, after Canada implemented use of the EMV technology in 2008, it experienced a 54% decline in counterfeit and lost or stolen card fraud from 2008-2013.  Chase Paymentech, "Preparing for the Transition to EMV Payments" (2015), at 2.

106.   The United States was one of the last countries to migrate to the EMV system.  According to EMVCo, 32% of transactions globally used EMV in 2014, including Africa and the Middle East (80% of transaction utilized EMV technology), Canada, Latin America and the Caribbean (85%), and parts of Europe (97%).  Meanwhile, only 0.12% of transactions in the United States used EMV technology during that same time period.

107.   Recently, Visa and MasterCard finally enacted policies to encourage adoption of the EMV standard in the United States.  In August 2011, Visa announced enactment of so-called "liability shift policies," effective October 2015. Press Release, "Visa Announces Plans to Accelerate Chip Migration and Adoption

of Mobile Payments," Aug. 9, 2011, *available at* https://usa.visa.com/about-

visa/newsroom/press-releases.releaseId.1594598.html.  MasterCard announced a

similar policy in January 2012.  According to these new policies, if a merchant is

presented with a payment card with EMV chip technology, but the merchant has

not yet begun using chip-reading terminals, liability for counterfeit fraud shifts

away from the card Issuer and instead to the merchant.  According to MasterCard

Worldwide's head of U.S. Product Delivery, Carolyn Balfany, "[i]f a merchant is

still using the old system, they can still run a transaction with a swipe and a

signature.  But they will be liable for any fraudulent transactions if the customer

has [used] a chip card."  Verifone, "The U.S. Government Shift to EMV

Payments" (2014) at 6.  But upgrading to new chip-reading terminals is a costly

endeavor, requiring upgrading or replacing checkout terminals.

108.   And even when Visa and MasterCard finally enacted policies to

encourage adoption of the EMV standard in the United States, they did so only in

half measure.  Consumers using credit or debit cards usually authenticate their

identities in one of two ways:  (i) by entering a PIN, as they do when they

withdraw cash from an ATM, or (ii) by signing a paper or electronic receipt.  PIN

verification is significantly more secure and less prone to fraud than signature

authentication.

109.   About 80 countries use credit and debit cards with EMV chips, and most of those require a PIN for verification in addition to the chip — so-called "chip-and-PIN" cards.  Countries such as Australia, Belgium, Canada, France, and the U.K. use chip-and-PIN cards.  Such cards offer an extra layer of security beyond the chip itself, by requiring the user to enter a four-digit PIN, thereby ensuring that the individual using the card is the card's owner.  Signatures can be copied or forged, and cashiers are not handwriting experts trained to identify forged signatures.

110.   In fact, though consumers likely believe that signatures will be verified in some manner in order to avoid fraudulent charges, Visa discourages merchants from asking customers for a form of identification so they can check the signature because, Visa claims, that might "deter the use of a Visa card and result in the loss of a potential sale," thus "Visa believes merchants should not ask for ID as part of their regular card acceptance procedures."  The member banks likewise do not typically collect verified signatures from cardholders or do anything to guarantee that the signature on the card is itself valid.  Between 2004 and 2010, the fraud rate for debit card transactions verified with a signature was significantly higher than transactions verified by a PIN.  By 2010, signature debit accounted for 91% of U.S. debit fraud.

111.   Despite the fact that signature verification feeds fraud, Visa and MasterCard have pushed for signature verification over PIN because it has significant consequences for how transactions are routed across networks.  If a cardholder enters a PIN to verify his or her identify, then the transaction is routed across a PIN debit network, while if the cardholder signs, the transaction is routed across a signature network.  Debit cards typically have the functionality to route transactions across PIN or signature networks.  The network over which a transaction is routed determines the Interchange Fee charged to merchants.  The Interchange Fee on signature transactions is markedly higher than the fee on PIN transactions.  According to data from the Federal Reserve Board, as of 2009, the average Interchange Fee for signature debit was 56 cents per transaction (or 1.53%) while the average fee for PIN debit was just 23 cents (0.56%).

112.   The higher Interchange Fee on signature transactions is a result of the fact that Visa and MasterCard do not have meaningful signature debit competition.

113.   When Visa and MasterCard finally enacted policies to encourage adoption of the EMV standard in the United States, they did so in a way that strongly favors signature over PIN in order to maintain their supracompetitive profits associated with signature verification.

1445310.1

114.   When merchants attempt to promote PIN, they are threatened and punished.  For example, when Walmart implemented a chip-and-PIN protocol at its stores throughout the United States, Visa asserted that Walmart's use of chip-and-PIN was a "material breach" of Walmart's agreement with Visa and threatened to disable its network at all Walmart locations.

115.   As Visa and MasterCard have rolled out EMV chips, they have gone further to maintain the dominance of signature verification.  The software installed on the new payment terminals for EMV chips favors Visa and MasterCard payment networks over PIN networks.  For example, Visa configured its system to default most transactions to Visa's debit networks and made it difficult for merchants to override that configuration.  Similarly, when customers insert a chip-based debit card into a new terminal, they may be offered only Visa's (or only MasterCard's) network as a choice.  When they do have multiple options, they are "Visa debit" (or "MasterCard debit") and "U.S. debit."  Since most consumers do not know what "U.S. debit" is — it is actually how Visa and MasterCard have opted to display PIN networks in order to confuse consumers — consumers usually pick Visa or MasterCard.  As a result, the transaction is routed over a signature network, and a PIN is not required.

116.   Given the lack of a PIN requirement in the United States, card-not-present fraud — such as that which occurs in online payments — may increase. Notably, shortly before announcing the "liability shift policies," Visa purchased an online fraud mitigation company, CyberSource.  Visa has knowledge that with the failure to implement a PIN requirement, fraud is likely to shift online, resulting in greater demand for the business of companies like CyberSource.

117.   Moreover, as Visa, MasterCard, and the Issuers decline to take available steps to decrease fraud in this manner, they force merchants to bear the cost and responsibility of reducing payment card fraud.  For instance, Visa and MasterCard require merchants comply with Payment Card Industry Data Security Standards ("PCI" or "PCI DSS"), a set of requirements adopted under the guise of standard-setting designed to ensure companies process and maintain payment card information in a secure manner.  But maintaining PCI compliance is a costly endeavor for merchants — and one which Visa and MasterCard do not reimburse.

118.   Despite the availability of technology to reduce fraud, Visa and MasterCard had no incentive to adopt it in the United States or compete on this basis because they could shift fraud-related costs to merchants and thereby profit from fraud while insulating the banks from its costs.  Visa's and MasterCard's ability to impose inferior quality card products and to permit preventable fraud

during the Damages Period is further direct evidence of their substantial market power.  To the extent The Home Depot was forced to absorb the costs of such fraud through chargebacks or fees or fines, such costs are damages that flow from the conspiracies.

119.   Visa's and MasterCard's substantial market power continued, and even increased, during the Damages Period.  The Home Depot cannot drop Visa or MasterCard General Purpose Credit or Debit Cards without losing an unacceptable number of sales.

> **6.     The Visa and MasterCard IPOs were changes in corporate form that maintained and enhanced the cartels.**

120.   During the Damages Period, the member banks that sat on the Visa and MasterCard boards, and controlled them, approved MasterCard's and Visa's reorganizations into corporate entities that offered a portion of their shares to members of the public through IPOs.  The member banks took advantage of their direct control over pre-IPO Visa and MasterCard to agree to post-IPO structures for Visa and MasterCard that were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Complaint.

121.   These IPOs were a response to the growing antitrust challenges and adverse legal rulings regarding Visa's and MasterCard's organizational structures as associations of competing member banks.  *See, e.g.*, MasterCard Incorporated

Amendment No. 8 to Form S-1 Registration Statement (May 23, 2006) at 72-73
(noting that MasterCard had "faced heightened regulatory scrutiny and legal
challenges in recent years").

122.   In response to these legal defeats and a host of additional antitrust
challenges, Visa and MasterCard, and their member banks, decided to change the
organizational structures of Visa and MasterCard in order to attempt to evade
antitrust liability through superficial changes in corporate form.  But in doing so,
the member banks agreed prior to the IPOs that post-IPO Visa and MasterCard
would continue to support the agreements not to compete and to fix prices.

123.   They implemented this agreement by structuring the IPOs so that they
cosmetically changed the corporate forms, while leaving the anticompetitive
conduct intact.  Pre-IPO, the member/owner banks conspired through Visa's and
MasterCard's governing boards and/or their ownership of Visa and MasterCard to
control every aspect of Visa's and MasterCard's businesses, including agreeing to
fix the prices of Interchange Fees through ratification of the default Interchange
Fee schedules and agreeing to set Visa's and MasterCard's rules, including
maintaining the Honor All Issuers rules.

124.   On May 22, 2006, MasterCard completed an IPO, which sold a partial
interest in MasterCard to public investors.  Through this IPO and related

1445310.1

59

agreements, the surviving entity acquired certain of its member banks' ownership and control rights in MasterCard through the redemption and reclassification of stock that was previously held by the member banks into non-voting "Class B" shares in post-IPO MasterCard.  In addition, the member banks each received a single "Class M" share that allowed them to elect up to 25% of the post-IPO MasterCard board and gave them veto power over certain of post-IPO MasterCard's decisions.  Post-IPO MasterCard financed this acquisition by selling to the public "Class A" shares, which represented a 49% equity interest in post-IPO MasterCard.  The Class B shares that are held by the member banks constitute 41% of the equity interest in post-IPO MasterCard.  A newly-created MasterCard Foundation was given a 10% equity share in post-IPO MasterCard.

125.   On March 19, 2008, Visa completed its own IPO.  Under a series of transactions that culminated in the IPO, Visa U.S.A., Visa International, Visa Canada, and Inovant became subsidiaries of a Delaware corporation known as Visa Inc.  After the subsidiaries were unified in Visa Inc., the stock was acquired in the former members of each subsidiary.  Once the restructuring was completed, Visa Inc. conducted an IPO of over 400,000,000 shares of Class A common stock.  This process was essentially the acquisition by Visa Inc. of certain member banks' ownership rights in Visa through the redemption and reclassification of

approximately 270 million shares of Visa stock previously held by the member banks in the form of Class B and Class C common stock.  Members of Visa U.S.A. acquired Class B Common Stock; other banks received Class C common stock.

126.   After the IPOs, MasterCard and its member banks, and Visa and its member banks, undertook no acts that were inconsistent with the purposes and goals of their prior collective action, and undertook no conduct that would tend to defeat those purposes, goals, or effects of their prior conduct.  To the contrary, post-IPO, Visa and MasterCard act as the pricing and rules enforcement agents for their member banks.  Through the corporate reorganizations and subsequent IPOs, each member bank effectively delegated to Visa and MasterCard, in perpetuity, the ability to fix the bank's pricing to merchants.  Each member bank knew that all other Visa and MasterCard member banks were also delegating their pricing decisions to Visa's and MasterCard's member banks when they voted to approve Visa's and MasterCard's restructurings on these bases.

127.   Moreover, as part of the corporate reorganizations leading to their respective IPOs, the member banks reaffirmed and effectively readopted each network's rules, including the default Interchange Fee and Honor All Issuers rules. Thus, the member banks' approval of this scheme was done knowing that all Visa and MasterCard member banks' Interchange Fees would be set by Visa and

MasterCard.  This was a conscious commitment to an ongoing common scheme by horizontal competitors and, as such, is a continuing violation of Section 1 of the Sherman Act.  It maintains the pre-IPO status quo:  Visa and MasterCard continue to set Interchange Fees for thousands of competing banks that, but for these conspiracies, would have independently competed for merchant acceptance.

128.   The IPOs increased the effectiveness of Defendants' price-fixing conspiracies as well as Visa's and MasterCard's substantial market power by consolidating decision-making and coordinating communications among the conspirators.  Visa's and MasterCard's economists opined in 1993 — well before these IPOs were being considered — that "[t]here would be far less competition in this industry if Visa and MasterCard had chosen to operate as single companies."  David S. Evans & Richard L. Schmalensee, *The Economics of the Payment Card Industry* (1993), at 103.

129.   Because the banks designed and approved the networks' rules and the networks' restructurings, the networks' conduct was essentially unchanged by the restructurings and the IPOs, so that the anticompetitive effects of these ongoing conspiracies continue to harm merchants and consumers.  The banks continue to adhere to the rules at issue, without exception.  And Visa and MasterCard continue to wield substantial market power over merchants as a result.  In this regard, Visa

and MasterCard and the member banks understood before the IPOs were consummated that, if Visa and MasterCard maintained the cartels' basic rule and structures, no bank would break rank and compete for merchant acceptance. That is precisely what happened.

130. Defendants' post-IPO conduct confirms that the IPOs did not terminate their price-fixing cartels or reduce Visa's and MasterCard's substantial market power. Visa's and MasterCard's anticompetitive rules, including the restraints at issue in this Complaint, have remained the same. Visa and MasterCard have exercised their substantial market power by imposing new network fees that merchants must pay. Visa has engaged in a campaign to maintain its monopoly power in the General Purpose Debit Card market. Perhaps most significantly, Visa's and MasterCard's Interchange Fees have remained at supracompetitive levels since the IPOs. This continuity demonstrates that the IPOs perpetuated Defendants' anticompetitive schemes and their substantial market power.

131. Government antitrust enforcers agree that these IPOs reflected changes merely in corporate form, not substantive conduct. In 2007, the European Commission's Competition Directorate issued a written determination that MasterCard's members had simply agreed to appoint MasterCard as their cartel

manager to act in their collective best interest in setting the level of Interchange

Fees.  In particular, the Competition Directorate's comprehensive decision found

as follows:

> MasterCard's viewpoint that the IPO . . . had changed the organisation's governance so fundamentally that any decision of MasterCard Incorporated's Global Board no longer qualifies as [a] decision of an association [of its member banks] but rather as [a] "unilateral" act which each member bank bilaterally agrees to abide by, cannot be accepted. . . . MasterCard's member banks shaped and eventually approved the IPO in order to perpetuate the MIF [Multilateral Interchange Fee] as part of the business model in a form that they perceived to be less exposed to antitrust scrutiny.  Contrary to MasterCard's argument, the aim of avoiding exposure to antitrust risks due to the MasterCard MIF was a clear driving force behind the IPO.  Rather than modifying the business model to bring it in line with EU competition law, the banks chose to change the governance of their co-ordination specifically for antitrust sensitive decision making.  The member banks effectively "*outsourced*" this decision making to a new management body and made sure that their direct influence . . . would be limited to minority rights.  However, the banks also agreed to the IPO . . . .after MasterCard's management assured them that the banks' interests will continue to be preserved under a new 'enhanced customer approach' and via the local input of the banks in the decision making.  *It cannot be doubted that in approving the IPO and thereby delegating the decision making powers for the MIF to the new independent Global Board, the member banks legitimately expected and therefore agreed that this Board would henceforth set the MIF in a manner that is in their common interests.*

European Commission Decision, COMP/34.579, ¶¶ 357, 378-79 (Dec. 19, 2007)

(emphasis added).

132.   The fact that a majority of MasterCard's post-IPO directors were "independent" did not change the role of MasterCard as the "outsourced" pricing agent and manager of the members' Interchange Fee cartel:

> The circumstance that members of the Global Board are "independent" within the meaning of the NYSE criteria . . . is not a decisive question for there to be an association of undertakings. As an organisation's members entrust decision making power to a common body with the expectations that the body's subsequent coordination of their competitive behavior will occur in the interest of the members, the independence of such body is no obstacle to qualifying its decisions as decision[s] of an association of undertakings.

*Id.* ¶ 381.  Moreover, "[d]evelopments after the IPO also indicate that MasterCard's management takes into account concrete banks['] interests in setting the level of fallback interchange fees." *Id.* ¶ 389.

133.   Even after the IPO, the "decisions of [MasterCard's] management bodies are still binding upon [its] members and no bank can participate in [MasterCard] without complying in all respects with [MasterCard's rules]." *Id.* ¶ 352.  The Commission also found that the post-IPO MasterCard entity "coordinat[es] the market behavior of the organisation's member banks," by enforcing uniform schedules of default Interchange Fees, *id.* ¶ 355, and that the IPO did not change the effect of MasterCard's default Interchange Fees, which both before and after the IPO "allow[ the member banks] to exploit [their]

collective market power by effectively putting a floor under the [merchant service charge] charged to merchants," *id.* ¶ 522.

134.   In May 2012, the European General Court affirmed the Commission's conclusions:

> [T]he Commission was legitimately entitled to take the view, in essence, that despite the changes brought about by MasterCard's IPO, the MasterCard payment organisation had continued to be an institutionalised form of coordination of the conduct of the banks. Consequently, the Commission was fully entitled to characterize as decisions by an association of undertakings the decisions taken by the bodies of the MasterCard payment organisation in determining the MIF.

*MasterCard, Inc. and Others v. European Commission*, Case T-111/08, ¶ 259 (May 24, 2012).  "[W]ith regard to merchants, what [MasterCard and its member banks] sought [post-IPO wa]s essentially the maximum threshold of their tolerance to the price of card transactions."  *Id.* ¶ 257.  In September 2014, the European Court of Justice — Europe's top court — likewise upheld the European Commission's decision:

> [T]he General Court considered the existence of a commonality of interests to be relevant in this instance not only on the basis of a theoretical concurrence of the banks' interests and those of MasterCard, but also having taken into account, in its definitive assessment of the facts, specific factual circumstances . . . including . . . the fact that it was undisputed that MasterCard was acting in the interests of the banks before the IPO; secondly . . . the developments after the IPO which indicate that that organisation is, in reality, continuing to take into account concrete banks' interests in setting the

level of the MIF; and thirdly . . . the fact that the interests of
MasterCard's shareholders do not conflict with those of the banks. In
those circumstances, it was open to the General Court to find . . . that
both the banks' residual decision-making powers after the IPO on
matters other than the MIF, and the commonality of interests between
MasterCard and the banks, were both relevant and sufficient for
purposes of assessing whether, after the IPO, MasterCard could still
be considered to be an 'association of undertakings', within the
meaning of Article 81 EC. . . . [T]he undertakings in question
pursued, over several years, the same objective of joint regulation of
the market within the framework of the same organisation, albeit
under different forms.

*MasterCard, Inc. and Others v. European Commission*, Case C-382/12 P, ¶¶ 71-76

(Sept. 11, 2014). In July 2015, the European Commission sent an additional

Statement of Objections to MasterCard, the result of a two-year investigation

started in April 2013, outlining the Commission's view that that certain additional

categories of interchange fees and rules limit competition, and lead to excessive

interchange fees. A similar investigation by the European Commission as to Visa

is ongoing.

### 7. Defendants' price-fixing schemes also are unlawful vertical price constraints.

135. The Interchange Fee price-fixing schemes adopted by Defendants also

constituted anticompetitive and unreasonable vertical price restraints. Visa and

MasterCard entered into express vertical agreements with each of their member

banks, binding all of their member banks to comply with the rules and regulations

1445310.1

of their networks, including the rules at issue in this Complaint.  In turn, Visa and MasterCard each acts as the enforcement agent and holds Issuing and Acquiring members responsible for compliance with the rules.  These two sets of vertical price restraints — one for Visa and its member banks, and the other for MasterCard and its member banks — continued in full effect during the Damages Period, including after Visa's and MasterCard's IPOs.

136.   For example, Rule 1.3 of the July 15, 2011 *MasterCard Rules* states: "[a]n applicant to be a Member must agree, and by execution and submission of an application to be a Member agrees, that it will comply with all applicable provisions of the Certificate of Incorporation and the Standards of this Corporation."  In turn, "Standards" is defined as:  "[t]he Amended and Restated Certificate of Incorporation, Bylaws, Rules, and policies, and the operating regulations and procedures of the Corporation, including but not limited to any manuals, guides or bulletins, as may be amended from time to time."  *See* Definitions, *MasterCard Rules* (July 15, 2011).  Similarly, the "General Overview" of the October 15, 2010 *Visa International Operating Regulations* states:  "[t]he *Visa International Operating Regulations* are set and modified by Visa to support the use and innovation of Visa products and services, and represent a binding contract between Visa and all Members."

**B.    Defendants' Interchange Fee Cartels Are Naked Restraints of Trade Without Justification**

137.    Defendants have argued over the years that Interchange Fees are cost-based and necessary mechanisms to reimburse Issuers to motivate them to issue General Purpose Payment Cards.  The facts show otherwise.

138.    General Purpose Payment Card systems have functioned successfully without Interchange Fees in the United States and internationally.  Payment card networks can thrive without Interchange Fees.  Moreover, the Interchange Fees set by Defendants are not based on cost.  Interchange Fees offer no procompetitive justification to offset the anticompetitive harm caused by the conduct detailed in this Complaint.

**1.    Banks would profit from issuing General Purpose Debit Cards even without collectively-set Interchange Fees.**

139.    General Purpose Debit Cards have long been positioned by Visa and MasterCard and the banks as a replacement for cash and checks, both of which have cleared "at par" (*i.e.*, zero interchange) for decades.  As such, Issuers have strong economic incentives to issue General Purpose Debit Cards even without income from Interchange Fees.  General Purpose Debit Cards provide numerous economic benefits to Issuers that justify their issuance even without Interchange Fees.  These benefits include:  (1) savings relative to the cost of processing checks

and cash; (2) motivating cardholders to maintain larger bank deposits, which Issuers can then lend; and (3) helping the Issuer to cross-sell other lucrative services, such as mortgages, home equity lines, and credit cards.  Moreover, issuance of General Purpose Debit Cards enhances the "stickiness" of the Issuer's valuable relationship with its customers.

140.   When banks first began to offer PIN Debit Cards in the United States, they did not charge Interchange Fees.  To the contrary, they sometimes even *paid* merchants to provide debit services, a practice known as "reverse," "negative," or "Issuer-paid" interchange.  Other banks provided debit services at par.  The market for General Purpose Debit Card Network Services expanded substantially during the time of Issuer-paid and at-par interchange.  This model prevailed until the early 1990s, when it changed only because Visa and MasterCard extended their cartels into debit.

141.   Beginning in the early 1990s, Visa and MasterCard aggressively began to implement and enforce a strategy to leverage their substantial market power in the General Purpose Credit Card market and force merchants to pay supracompetitive General Purpose Debit Card Interchange Fees.  The linchpin of this strategy was the enforcement of "credit/debit tying rules" which, until January 1, 2004, forced merchants that accepted Visa's and MasterCard's dominant

General Purpose Credit Cards to also accept the networks' Signature Debit Card transactions.  Visa and MasterCard set the same or similar Interchange Fees for General Purpose Credit Card and Debit Card transactions notwithstanding the different costs and demand characteristics of such transactions.  Merchants had no choice but to accept Visa's and MasterCard's dominant, supracompetitively-priced General Purpose Credit Card products and were, therefore, forced to accept supracompetitive Signature Debit Card Interchange Fees.

142.   Visa and MasterCard then used the lucrative Interchange Fee stream created by this practice to induce additional Issuers to participate in the conspiracy and thereby entrench their dominance in the General Purpose Debit Card market. This strategy successfully destroyed the at-par interchange model that had prevailed for debit prior to the 1990s, as Visa and MasterCard had intended. Moreover, it distorted banks' incentives in debit, causing them to push the less secure, less efficient Signature Debit Card products of Visa and MasterCard and to suppress the safer, cheaper, and faster PIN Debit Card products that were being promoted by the competing PIN Debit Card networks, such as Pulse and STAR.

143.   The substantial non-interchange economic benefits of issuing General Purpose Debit Cards explain why Issuers did not anticipate any significant adverse impact as a result of the regulatory cap that the Federal Reserve placed on General

Purpose Debit Card Interchange Fees in the United States pursuant to the Durbin Amendment discussed above.  Addressing that impending regulatory cap, the CEO of Citigroup said:  "We don't have much of an impact on debit card interchange or . . . overdraft fees, those are really small impacts on us."  Citigroup Inc. Q4 Earnings Call Transcript (Jan. 18, 2011).  The Chairman and CEO of City National Corporation predicted:  "The Durbin amendment on debit card interchange fees . . . its economic impact on City National is not going to be material."  City National Corporation Q4 2010 Earnings Call Transcript (Jan. 20, 2011).  TCF Financial Corp.'s Chairman and CEO added that "[w]e'll obviously still be profitable" even if there is a cap imposed on debit Interchange Fees.  *TCF Discusses Lawsuit Challenging Durbin Amendment* (Oct. 12, 2010), at 7.

144.   The fact that General Purpose Debit Card issuance continues to be profitable, and that debit volumes have increased since General Purpose Debit Card Interchange Fees for regulated banks declined significantly beginning in late 2011, reinforce the conclusion that General Purpose Debit Card Interchange Fees had been fixed at supracompetitive levels throughout the Damages Period.

145.   The experience in other industrialized countries also highlights that the development of debit in the United States, with cartel-determined supracompetitive Interchange Fees, was a function of anticompetitive conduct in

the General Purpose Debit Card industry in this country.  Virtually all the countries

with the highest debit usage — including Canada, Denmark, Finland, Iceland, the

Netherlands, New Zealand, and Norway — utilize an at-par interchange pricing

model.  For example, the Canadian debit system has always been based on at-par

pricing, and Canada has traditionally had higher per capita debit usage than the

United States, as well as higher debit penetration in merchant categories that do not

accept PIN Debit Cards in the United States.

146.   The vast and successful U.S. checking system also demonstrates that

Interchange Fees are not necessary for a General Purpose Debit Card Network to

function.  Since 1916, by rule of the Federal Reserve, trillions of dollars of checks

drawn on the U.S. national banking systems have cleared at par.  Despite this

prohibition on Interchange Fees, banks have continued to offer checks to their

customers and have continued to accept and cash checks issued by other banks.

### 2.     Banks would profit from issuing General Purpose Credit Cards even without collectively-set Interchange Fees.

147.   The Visa and MasterCard networks could function efficiently without

fixed Interchange Fees and/or other merchant restraints.  In the 1980s, the default

Interchange Fee rules were rationalized as being necessary to give General Purpose

Credit Card Issuers incentives to issue such cards.  By 1990, it was apparent that

General Purpose Credit Card Issuers were earning substantial profits from interest

rates on revolving balances and annual fees, and therefore Interchange Fees were

unnecessary to encourage General Purpose Credit Card issuance.  Since then, the

evidence has continued to show that General Purpose Credit Card Issuers can be

profitable without collectively-set Interchange Fees.

148.   International experience regarding Interchange Fees on General

Purpose Credit Card transactions also indicates that Interchange Fees in the United

States have been fixed at supracompetitive levels.  In Australia, the Reserve Bank

of Australia ("RBA") extensively investigated the domestic Australian payment

card industry.  In 2002, as a result of that investigation, the RBA ordered Visa and

MasterCard to reduce their domestic Interchange Fees by nearly 50% (to an

average of 50 basis points), rates that are much lower than those that prevailed in

the United States during the Damages Period.

149.   Prior to enactment of these regulations, Visa and MasterCard argued

that such a reduction in Interchange Fees would cause a "death spiral" that would

lead to a collapse of their networks and upheaval in the industry.  In reality, no

such "death spiral" or collapse occurred.  Visa's and MasterCard's General

Purpose Credit Card volumes have *increased* in Australia since the regulations

went into effect.  Indeed, the European General Court recently reviewed the

evidence from Australia and concluded:  "[i]t is clear . . . that a substantial

reduction in the MasterCard system's interchange fees that was imposed by the Reserve Bank of Australia had no notable impact on the system's viability . . ." *MasterCard, Inc. and Others, European Commission*, Case T-111/08, ¶ 111 (May 24, 2012).

150.   Similarly, the European Commission undertook a comprehensive study of General Purpose Credit Card Interchange Fees in Europe, and its Competition Directorate undertook antitrust investigations into Interchange Fees charged by MasterCard's and Visa's European affiliates.  In 2002, the Commission and Visa reached a settlement that lowered Interchange Fees first to 0.7%, and then to a cost-based standard if lower.  This commitment expired in 2007, and the Commission began a new investigation, which continues.

151.   Following Visa's 2002 commitment to limit consumer General Purpose Credit Card Interchange Fees to 0.7%, Visa Europe announced in May 2013 that it will limit Interchange Fees to 0.3%.  In 2007, the Commission found MasterCard's setting of Interchange Fees to be unlawful, and MasterCard agreed to cap its Interchange Fees for transactions crossing national borders at 0.3% during the pendency of its appeal of that decision.  For years, therefore, the resulting European Interchange Fees have been substantially below those that prevail in the United States that often exceed 2.00% due to the proliferation of Premium

Payment Cards.  Again, there have been no adverse effects — Visa's and MasterCard's General Purpose Credit card volumes in Europe have increased during this period.

152.   Similarly, in 2005, the Office of Fair Trade ("OFT") — the antitrust-enforcement body in the U.K. — concluded after a four-year investigation that MasterCard's domestic Interchange Fees violated the U.K.'s counterpart to Section 1 of the Sherman Act.  In addition to finding that MasterCard had market power in the relevant markets for payment card issuance, acquisition and a "wholesale" market, the OFT also found that the Interchange Fee was used to extract extraneous costs, *i.e.*, those not necessary to the functioning of a payment card network.  Visa and MasterCard in the United States often hold up two of the very "extraneous costs" the OFT identified — the cost of "rewards" and the cost of the interest-free "float" period — as examples of costs that justify the imposition of uniform schedules of Interchange Fees on merchants.

153.   In neither Australia nor the European Union do Visa and MasterCard enjoy the economies of scale and scope associated with the much larger General Purpose Payment Card markets in the United States.  Visa's and MasterCard's General Purpose Credit Card Interchange Fees in the United States are *higher* than

nearly every other General Purpose Credit Card Network outside the United States, including Visa's and MasterCard's own networks in other countries.

154.   The costs associated with issuing Visa and MasterCard General Purpose Credit Cards have declined dramatically since 1990.  Issuer costs of funding a cardholder's grace period — known as float costs — have fallen significantly.  Visa and MasterCard General Purpose Credit Card Issuers have enjoyed additional savings from substantial decreases in hardware, processing, and telecommunications costs, as well as through economies of scale that have resulted from vastly-increased transaction volumes and concentration of card issuance through bank mergers and card portfolio acquisitions.

155.   Notwithstanding these declines in Issuer costs, however, Visa and MasterCard have substantially raised their Interchange Fees.  For example, Visa has raised the Interchange Fees and/or cost of acceptance that apply to Visa General Purpose Credit Card transactions throughout the Damages Period. MasterCard has done the same.  This demonstrates that Interchange Fees are not based on costs, but rather are a cartel's anticompetitive exercise of market power.

156.   Visa and MasterCard have argued that default Interchange Fees are justified because, as a result of their Honor All Issuers rules, an individual Issuer could otherwise potentially "hold up" merchants that accept Visa's and

MasterCard's General Purpose Payment Cards by charging as high an Interchange Fee as the Issuer wishes.

157.   This "hold up" problem is the result of the banks' anticompetitive agreements not to compete for merchant acceptance, *i.e.*, the Honor All Issuers rules.  Attempting to justify Interchange Fee price fixing on the grounds that it addresses the problems of an agreement not to compete, as Defendants have sought to do, is perverse.  Price fixing in tandem with an agreement not to compete is not a justification for anticompetitive conduct.  It *is* anticompetitive conduct.

158.   Moreover, these schemes create a staggering amount of anticompetitive harm.  Even if the elimination of this additional anticompetitive "hold-up" problem (an anticompetitive problem created by the schemes themselves) was credited as a procompetitive benefit — which it should not be — any such "benefit" would be far exceeded by the remaining anticompetitive harm resulting from those schemes that is detailed throughout this Complaint.

> **3.    Anti-steering rules hide the costs of Visa and MasterCard transactions from consumers, thereby inhibiting competition from other networks and reinforcing the Visa and MasterCard cartels.**

159.   In a competitive world, some merchants could have used financial incentives and marketing to steer customers to other networks or forms of payment and, by increasing customers' price sensitivity to Interchange Fees, steering could

have led to network competition.  Visa and MasterCard prevented this from happening by enforcing anti-steering rules that prohibited merchants from making the cost of Visa and MasterCard transactions transparent to consumers and from making consumers who use the cards bear the associated costs.

160.   During the Damages Period, the anti-steering rules included Visa's and MasterCard's rules that prohibited merchants from offering discounts to consumers that used General Purpose Payment Cards that were less expensive than Visa or MasterCard General Purpose Payment Cards.  These rules remained in effect until Visa and MasterCard revised them to permit such discounting pursuant to a July 20, 2011 consent decree they entered into with the Antitrust Division. Visa and MasterCard, however, still prohibit merchants from offering discounts that encourage consumers to use cheaper forms of payment, including one bank's Visa or MasterCard General Purpose Payment Cards instead of more expensive Visa or MasterCard General Purpose Payment Cards issued by other banks.  Such discounting by Visa or MasterCard Issuers would force Visa and MasterCard member banks to compete for merchant acceptance.

161.   The anti-steering restraints also include rules that prevented (and still prevent) banks from linking to multiple networks on General Purpose Credit Cards.  Because of the way the General Purpose Debit Card industry developed,

with most cards originating as ATM/PIN Debit Cards, General Purpose Debit

Cards have long had multiple network linkages (or "bugs") on them, and that has

facilitated the most effective form of steering for merchants — routing transactions

to cheaper General Purpose Payment Card Networks.  There is no technical reason

why multiple network functionality could not co-reside on General Purpose Credit

Cards.  Visa and MasterCard rules, however, blocked that from happening

throughout the Damages Period.

162.   The anti-steering restraints also include the rules that prevent

merchants that accept Visa and MasterCard from testing differential acceptance or

new ways to steer transactions to cheaper General Purpose Payment Card

Networks at certain locations that operate under a single banner.  That is the way

most merchants pilot new products, and such testing would have enabled

merchants to introduce new ways to force the banks to compete for merchant

acceptance.

163.   The anti-steering rules also included Visa's and MasterCard's

prohibitions against surcharging their transactions.  Visa's previous no-surcharge

rule provided that "[a] Merchant must not . . . [a]dd any surcharge to

[t]ransactions."  *See, e.g.*, Rule 5.2.F, *Visa U.S.A. Inc. Operating Regulations,*

*Volume 1—General Rules* (Nov. 15, 2008).  MasterCard's previous no-surcharge

rule similarly provided that "[a] Merchant must not directly or indirectly require any [MasterCard] Cardholder to pay a surcharge or any part of any Merchant discount . . . ." *See, e.g.*, Rule 5.9.2, *MasterCard Rules* (Feb. 2008); Rule 5.11.2 *MasterCard Rules* (May 2010) (same).  These rules prohibited merchants from surcharging cardholders who use their higher-priced premium card rather than their lower-priced standard card, and eliminated any incentive for Visa, MasterCard, or any Issuing Bank to charge a lower Interchange Fee, because such fees will not be visible to consumers.

164.   As of January 27, 2013, as part of their obligations under the class settlement granted final approval on December 13, 2013 in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 05-md-1720, Mem. and Order (E.D.N.Y. Dec. 13, 2013), Visa and MasterCard made minor alterations to their No Surcharge rules in order to permit merchants to surcharge credit card customers under limited circumstances until July 20, 2021. (Definitive Class Settlement Agreement ¶¶ 42, 55.)  Even as modified, however, the No Surcharge Rules, for example, prohibit a merchant from surcharging based on the identity of the card Issuer, and debit card transactions still may not be surcharged.

165.    There were no procompetitive justifications for these anti-steering rules.  If merchants had not been restrained by these rules, some of them could have played Visa and MasterCard or the banks against one another by steering or threatening to steer customers away from using more expensive Visa and MasterCard General Purpose Payment Cards.  Were it not for the restraints, merchants could have used such tactics to try to negotiate more favorable terms from Visa or MasterCard or from individual Issuers.  As a result, the anti-steering rules, individually and collectively, exacerbated the anticompetitive effects of the conspiracies.

**C.    Visa and Its Member Banks Engaged In Additional Anticompetitive Conduct That Monopolized, or Attempted to Monopolize, the General Purpose Debit Card Services Market**

166.    Visa and Visa's member banks' anticompetitive conduct has not been limited to the Interchange Fee price-fixing cartels detailed above.  Visa and Visa's member banks engaged in additional conduct to exclude competition with the purpose and effect of giving Visa a monopoly in the market for General Purpose Debit Card Network Services.  This included conduct occurring during the Damages Period, such as dedication agreements between Visa and Issuers of Visa General Purpose Debit Cards and the imposition of fixed network fees to blunt competition in the General Purpose Debit Card market.

167.   These exclusionary acts have continued to suppress competition in the market for General Purpose Debit Card Network Services, and thereby have enabled Visa and its member banks to charge higher Interchange Fees and Visa to charge higher network fees than they otherwise would have been able to charge merchants.

### 1.   Visa's strategy to maintain its monopoly power in the General Purpose Debit Card market.

168.   At or around the time the Damages Period began, Visa possessed monopoly power in the General Purpose Debit Card market.  Its share of that market was approximately 60%, as it comprised 80% of the Signature Debit Card segment and was increasing its PIN Debit Card share through deals with the largest Issuers of Visa General Purpose Debit Cards.  By early 2004, Visa had entered into long-term dedication agreements with most of its large Issuers that "prevent[ed] Visa banks from switching to MasterCard" which, at the time, was the only other Signature Debit Card network.  *United States v. Visa U.S.A. Inc.*, No. 98-cv-7076(BSJ), 2007 WL 1741885, at *2 (S.D.N.Y. June 15, 2007).  Accordingly, Visa "essentially lock[ed] up 89% of the volume of its top 100 debit Issuers."  *Id.* at *1. Those deals and the installed base of Visa- and Interlink-branded General Purpose Debit Cards enabled Visa to maintain its monopoly power even after it was forced

to relinquish the tying rule by the antitrust settlements in the *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG) (E.D.N.Y.).

169.   By 2005, Visa's Interlink became the leading PIN Debit Card network with 36% of that segment of the General Purpose Debit Card market.  Visa maintained that position in PIN Debit, along with its dominant position in Signature Debit, throughout the Damages Period.  It did so through various deals with debit Issuers.  These deals, entered on exclusive or near-exclusive terms, made Visa's Interlink the exclusive or primary PIN Debit Card acceptance mark on well over 100 million debit cards.  These deals gave Visa the power to raise Interlink's Interchange Fees because, even if a merchant tried to drop Interlink and its high rates, the merchant would pay more as transactions defaulted to the still-pricier Visa Signature Debit Card rates.  There were no other options on many Visa General Purpose Debit Cards.  This exclusivity on many such cards remained intact until April 2012, when Federal Reserve regulations mandated that General Purpose Debit Card Issuers put a competing network's functionality on their debit cards.

170.   Visa used its monopoly power to suppress PIN Debit during the Damages Period.  As Visa continued to drive up Interlink Interchange Fees, the competing PIN Debit Card networks raised their rates to maintain volume in a

market that had long been dominated by Visa.  The result was the convergence of

PIN Debit Card and Signature Debit Card rates at high *ad valorem* prices, a trend

that contributed significantly to the suppression of PIN Debit Card acceptance in

the United States, a longstanding Visa objective.  With Signature Debit Card and

PIN Debit Card Interchange Fees coming into alignment, merchant willingness to

install PIN pads to accept PIN Debit Cards was materially reduced.  In PIN Debit

alone, in large part because of Visa's conduct, merchants faced market-wide

effective Interchange Fee increases of an estimated 234% between 1998 and 2006.

> **2.      Visa's strategy to maintain its monopoly power in the General Purpose Debit Card market post-Durbin.**

171.   By 2010, when Congress passed the Durbin Amendment, Visa's

monopoly power in the General Purpose Debit Card market rested primarily on

two anticompetitive prongs — the greater Interchange Fees associated with

Signature Debit than PIN debit (which buttressed Visa's leading position in

Signature Debit) and Visa's exclusive (Signature and/or PIN Debit) deals with

many of the largest debit Issuers.

172.   The Durbin Amendment threatened both for two reasons.  First, the

regulations the Federal Reserve promulgated regarding General Purpose Debit

Card Interchange Fees eliminated the distinction between Signature and PIN Debit

for the large regulated Issuers that supported the dominance of Visa Check, Visa's

1445310.1

Signature Debit product.  Second, the Durbin Amendment repealed Visa's

exclusive deals with Issuers by requiring that all General Purpose Debit Cards bear

an unaffiliated network on each card.  That requirement subjected Visa to potential

competition to reduce Interchange Fees and network fees to win merchant routing

decisions.  Many commentators observed that Visa could lose significant portions

of its volume, and at least one concluded that up to 80% of its PIN Debit volume

was at risk.

173.   Visa responded by implementing a fixed fee known as the Fixed

Acquirer Network Fee ("FANF") effective April 2012, which applies to the

acceptance of Visa-branded products and is based on the size and number of the

merchant's locations.  The FANF is effectively a fee merchants must pay to be a

part of the Visa network.  This new fee is nothing more than a creative and

anticompetitive mechanism for penalizing merchants for routing debit transactions

over any rival debit network.

174.   If a merchant accepts any Visa General Purpose Payment Card

transactions, credit or debit, the merchant must pay this fixed fee to "access"

Visa's networks and, perversely, the more locations the merchant operates, the

greater the fee it has to pay.  This construct restores the tie between General

Purpose Debit Card acceptance and General Purpose Credit Card acceptance that

Visa previously utilized as the linchpin of its strategy to dominate the General Purpose Debit Card market.  It does so because the only way merchants can avoid the fee is to drop all Visa products, and the only way merchants can mitigate the fee is to route their General Purpose Debit Card volume to Visa.

175.   The FANF further penalizes a merchant for routing a transaction over a competing PIN Debit network because, if the merchant did that, then it would not be able to reduce its fixed fee by shifting volume to Visa.  In fact, because the merchant must pay Visa's fixed fee whether it routes the transaction to Visa or not, the merchant will, in effect, pay twice for transactions routed over competing PIN debit networks — an up-front payment to Visa simply to be a part of the Visa network, and a second payment to a competing PIN debit network for any particular transaction not routed to Visa.

176.   Visa uses the FANF to maintain its monopoly power by compromising the PIN Debit networks' ability to compete and neutralizing the competitive dynamic the Durbin Amendment was intended to introduce.  While Visa leveraged its power in the General Purpose Credit Card market to distort competition in the General Purpose Debit Card market with the FANF, the rival PIN Debit networks cannot do that.  If they tried to implement such a fee, merchants would stop accepting their General Purpose Debit Cards.  Visa has

maintained its monopoly power, not because it has better General Purpose Debit Card Networks, but because it has the power to use a tying arrangement and an anticompetitive fixed fee to foreclose competition.

177.  Visa and MasterCard have also used consumers' lack of sophistication to circumvent the Durbin Amendment's goal of providing merchants with routing choice.  As noted above, for example, Visa has programmed EMV terminals to offer consumers a choice between "Visa debit" and "U.S. debit."  Visa did this because it knows that, since most consumers are not aware that "U.S. debit" refers to more economical PIN debit networks (as opposed to Visa's and MasterCard's more expensive signature debit networks), consumers are inclined to select Visa — even when merchants would prefer that consumers choose other less expensive options.

178.  Industry analysts recognized that Visa's conduct was likely to severely foreclose competition from PIN Debit Card networks and cement Visa's market power:

- "Tapping the entire Visa customer base to subsidize aggressive PIN-debit pricing should significantly boost Interlink's market share, possibly above today's exclusivity-driven levels.  This aggressive approach is clearly bad news for competing PIN-debit networks as they simply won't be able to match price with post-Durbin Visa."  *See* Chris Brendler *et al.*, "New Fee Structure; Near-Term Pain, Long-Run Gain," *Stifel Nicolaus* (Aug. 1, 2011) at 3.

- "In our view, the [FANF], once established, should actually increase Visa's long-run pricing power since merchants will have little ability to deter future price increases . . . [W]e think this fee gives Visa enormous long-run pricing power as there are few governors on future price increases . . . Over time, we think Visa near-term margin sacrifice will be easily offset by market share gains and additional pricing power." *Id.* at 1, 3.

179.   As a result of this conduct, Visa's share of the General Purpose Debit Card market remains at monopolistic levels and is poised to increase, and its ability to impose supracompetitive and economically unjustified fixed network access fees reflects its continuing monopoly power.

180.   More recently, Visa has announced new fees designed to punish Issuers that would consider undercutting Visa's power in the debit market by allowing or encouraging merchants to route to lower-cost PIN networks.

181.   Visa gave this new fee the cryptic name "Delayed De-Conversion Assessment" ("DDCA"), and stated it would be imposed on Issuers that experience "sustained material decline in Visa payment volume or card counts" or demonstrate "an intent to change business status or network affiliation."  In other words, if an Issuer dared to take steps that might allow a merchant to route Visa-branded card transactions to a non-Visa network, the Issuer would be punished with higher fees.

182.   In June 2016, Senator Dick Durbin wrote a letter to Visa denouncing the DDCA, and noting its anticompetitive effects:  "Simply put, Visa appears to be

1445310.1

89

imposing a significant penalty on card issuers that try to shift their business from Visa to a competing card network or that see their business shifted to competing networks through market forces."  Senator Durbin explained that his "amendment [the Durbin Amendment] has worked to enhance competition between card networks and preserve the ability of small banks and credit unions to compete fairly in the card issuance market," and that "Visa's new fee could diminish competition between networks and penalize small banks and credit union issuers." Under pressure, Visa indicated it was not planning any longer to impose the DDCA.  But Visa had already made clear its intent and ability to punish Issuers that threaten Visa's market dominance by supporting PIN debit.

183.   Notably, and indicative of the ongoing coordination between Defendants, MasterCard acted in parallel fashion to Visa's announcement of the DDCA fee by adding its own anti-routing penalties.  MasterCard stated it was increasing its "volume assessment" from 0.2 to 3 bps — *a fifteenfold increase* — effective July 2016.  As with Visa's fee, this "volume assessment" punishes Issuers if transactions initiated with a MasterCard-branded card are routed to an alternative network.

184.   As a result of Visa's and MasterCard's conduct, Issuers will be averse to incentivizing the use of low-cost PIN networks on their issued debit cards or

otherwise allowing merchants to route debit transactions over alternative networks. While Visa and MasterCard had previously ensured Issuer compliance with the carrot of inflated interchange, they now ensure Issuer compliance with the stick of "volume assessments" or threatened "Delayed De-Conversion Assessments."

185.   Visa's monopoly power in the General Purpose Debit Card market is protected by high barriers to entry.  To be a viable payment network competitor, a potential entrant would need both (1) widespread, if not ubiquitous, merchant acceptance, and (2) large-scale distribution to consumers through Issuers.  While each poses a formidable barrier in its own right, the economic reality is that a new entrant must clear both barriers simultaneously.  Merchants are generally unwilling to accept a payment card brand that is carried by few cardholders, and cardholders are generally unwilling to carry a payment card brand that is not widely accepted by merchants.  Therefore, starting a new network, whether debit or credit, with sufficient scale to challenge Visa or MasterCard is extremely difficult.  These high barriers to entry, coupled with the entrenched dominance of Visa and MasterCard, explain in large part why no meaningful entry has occurred in the General Purpose Credit Card and Debit Card markets since Discover entered three decades ago in 1985.

186.   The Antitrust Division recently highlighted this structural barrier to entry in the context of the General Purpose Credit Card market in its Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and MasterCard in *United States v. American Express Company*, No. 10-cv-4496-NGG-RER, Dkt. No. 5 (E.D.N.Y. Oct. 4, 2010):

> Significant barriers to entry and expansion protect Defendants' market power, and have contributed to Defendants' ability to maintain high prices for years without threat of price competition by new entry or expansion in the market.  Barriers to entry and expansion include the prohibitive cost of establishing a physical network over which General Purpose Card transactions can run, developing a widely recognized brand, and establishing a base of merchants and a base of cardholders.  Defendants, which achieved these necessities early in the history of the industry, hold substantial early-mover advantages over prospective subsequent entrants.  Successful entry today would be difficult, time consuming, and expensive.

*Id.* at 7.

## ANTITRUST INJURY

187.   Defendants' price-fixing cartels and Visa's monopolistic conduct have caused substantial and ongoing anticompetitive harm to merchants as direct purchasers of General Purpose Payment Card Network Services in the form of inflated Interchange Fees paid directly by those merchants, foreclosure of network competitors, and reduced output.  Merchants and their customers have borne —

and continue to bear — the brunt of hundreds of billions of dollars of supracompetitive fees and severely decreased consumer welfare.

188.   The Home Depot has suffered direct antitrust injury from Defendants' conduct in violation of the antitrust laws set out above.  During the Damages Period, The Home Depot had a contract with Acquirers under which The Home Depot paid the applicable Interchange Fee to the relevant Issuer with respect to transactions in which The Home Depot accepted a Visa or MasterCard General Purpose Payment Card as a method of payment.  As a result, The Home Depot paid (and continues to pay) substantial, unlawful overcharges as a direct result of the price fixing and monopolization set out in this Complaint.  The Home Depot also was (and continues to be) deprived of the benefits of competition limited by this conduct in the relevant markets.

189.   Interchange Fees are the most onerous bank fees that The Home Depot pays.  The Home Depot's bank-card acceptance costs are nearly $750 million per year as of 2015.

190.   The imposition of supracompetitive Interchange Fees distorted Issuer incentives in both markets, perpetuating the fraud-prone magnetic strip system in the United States.  This diminution of innovation is a further harm to competition.

## RELEVANT MARKETS

191.   Merchants' demand for General Purpose Payment Card Network Services (authorization, clearance, and settlement of transactions for which a merchant accepts a General Purpose Payment Card) stems from consumer demand for using General Purpose Payment Cards to pay for goods and services. Accordingly, because consumer demand establishes both a distinct General Purpose Credit Card market as well as a General Purpose Debit Card market, there are corresponding markets, based upon derived merchant demand, for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

**A.    There Are Distinct Markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services**

**1.    General Purpose Credit Card Network Services.**

192.   There have been relevant product markets for General Purpose Credit Cards and General Purpose Credit Card Network Services throughout the Damages Period.  The existence of these markets have been confirmed by economic analysis of cross-elasticity of demand, by industry and public recognition, and by recent judicial decisions in cases related to the claims asserted in this Complaint.  These markets continue to be relevant product markets to this day.

1445310.1

193.    Certain characteristics of credit cards make them unique from the cardholder's perspective.  General Purpose Credit Cards allow a consumer to purchase goods and services by accessing a line of credit extended to the cardholder by the Issuer that issued the card.  These cards provided (and still provide) consumers deferred payment and, typically, the opportunity to revolve balances over time.  Charge Cards are a subset of General Purpose Credit Cards that require consumers to pay off the balance owed upon receipt of their statement, usually monthly.

194.    From the consumer perspective, there are no close substitutes for General Purpose Credit Cards because other forms of payment do not offer comparable credit facilities.  Therefore, General Purpose Credit Cards are better suited for large purchases that a consumer needs to finance over time than are payment methods such as cash, checks, and General Purpose Debit Cards that do not allow deferred payment.  This feature is reflected in studies of consumer payment patterns, which show that the average transaction size for General Purpose Credit Card transactions consistently has significantly exceeded the average ticket for General Purpose Debit Card transactions since the mid-1990s.

195.    In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), the court held that "consumers . . . do not consider debit cards to be

substitutes for general purpose [credit] cards." *Id.* at 336.  Most consumers do not want to carry large sums of cash to make large purchases, and checks do not match the acceptance of General Purpose Credit Cards.

196.   Thus, evidence demonstrates that General Purpose Credit Cards have a unique bundle of characteristics that consumers find useful for certain types of transactions, and for which other payment methods are not close substitutes.  A market-wide increase in cardholder fees would not cause sufficient decline in usage for the price increase to be unprofitable to Issuers; demand is sufficiently inelastic to establish a market for General Purpose Credit Cards.  This has been the case throughout the Damages Period.

197.   As the court held in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, "it is highly unlikely that there would be enough cardholder switching away from credit and charge cards to make any such [hypothetical] price increase unprofitable for a hypothetical monopolist of general purpose [credit] card products." *Id.* at 336.

198.   The events in 2003 following the settlement of the *Visa Check* class action challenging the credit/debit tying rules also support the conclusion that General Purpose Credit Cards and Debit Cards are in separate markets.  The settlements required Visa and MasterCard to untie General Purpose Credit Card

and Debit Card acceptance and give merchants the right to choose to accept one product without the other, and to temporarily decrease their Signature Debit Card Interchange Fees.  Once the settlements went into effect and the tie between credit and debit acceptance was broken, Visa and MasterCard increased General Purpose Credit Card Interchange Fees, which increased the percentage-fee gap between credit and debit rates.  In MasterCard's case, the gap between credit and signature debit increased from 4 basis points to 73 basis points.  Despite these significant price increases, credit-card purchase volume continued to rise after the settlement. At the same time, no major merchant stopped accepting Visa or MasterCard credit cards.  This outcome demonstrates that General Purpose Credit Cards and Debit Cards are in separate markets.

199.   Interchange Fees for both PIN Debit Cards and Signature Debit Cards have decreased since the Federal Reserve promulgated regulations pursuant to the Durbin Amendment, but General Purpose Credit Card Interchange Fees have not decreased in response to reduced General Purpose Debit Card fees to merchants. The absence of sensitivity of General Purpose Credit Card Interchange Fees to Interchange Fees for General Purpose Debit Cards is strong economic evidence that General Purpose Credit Cards and Debit Cards are not in the same relevant market.

1445310.1

200.   During the Damages Period, Visa and MasterCard have continued to raise General Purpose Credit Card Interchange Fees, including significant rate increases for Premium Payment Card transactions, and no major merchants have stopped accepting Visa and MasterCard General Purpose Credit Card transactions. This shows that merchants continue to believe that a sufficient number of consumers view General Purpose Credit Card as unique and that merchants must accept them.  General Purpose Credit Card Network Services is a well-defined market characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole.

### 2.     General Purpose Debit Card Network Services.

201.   There have been relevant product markets for General Purpose Debit Cards and General Purpose Debit Card Network Services throughout the Damages Period.  These markets consisted of both Signature Debit Cards and PIN Debit Cards.  The existence of these markets has been confirmed by economic analysis of cross-inelasticity of demand, by industry and public recognition, and by recent judicial decisions in cases related to the claims asserted in this Complaint.  These markets continue to be relevant product markets to this day.

202.   General Purpose Debit Cards permit consumers to purchase goods and services by directly accessing the consumer's asset account, usually a DDA or

checking account.  General Purpose Debit Cards include stored-value cards, such as payroll cards and flexible spending account cards, where funds are pre-loaded into an account associated with the card and the cardholder can only spend up to the amount pre-loaded on the card.  Depending on the type of debit transaction, payment is withdrawn from the cardholder's account and transferred to the merchant within one to several days later.

203.   Both PIN Debit Cards and Signature Debit Cards offer basically the same functionality to consumers — a means of payment that is widely accepted and provides for a quick and automatic transfer of funds from the cardholder's asset account (usually a checking account) to the merchant's account.  While the signature and PIN methods of authentication differentiate the products, consumers tend to view them as close substitutes.  Merchants' ability to steer cardholders from Signature Debit Cards to PIN Debit Cards confirms this.

204.   General Purpose Debit Cards possess a combination of characteristics that make them particularly well-suited for certain types of transactions.  Because payments are deducted in a matter of hours (or a few days at most) from a consumer's DDA, General Purpose Debit Cards are strongly differentiated from General Purpose Credit Cards.  Consumers do not consider General Purpose Credit Cards to be an adequate substitute for General Purpose Debit Cards.  Consumers

tend to use General Purpose Debit Cards for everyday purchases, such as groceries, small household items, and other small value purchases, especially of non-durable goods.  Many consumers segment their purchases and prefer to put these everyday purchases on their General Purpose Debit Cards and use their General Purpose Credit Cards for larger-ticket items that are not consumed on a monthly basis.

205.   In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, the court held that:

> Consumers . . . do not consider debit cards to be substitutes for general purpose [credit] cards.  Due to their relative lack of merchant acceptance, their largely regional scope, and their lack of a credit function, on-line debit cards, which require a PIN number, are not adequate substitutes for general purpose credit cards.  Similarly Visa and MasterCard research demonstrates that consumers do not consider off-line debit cards to be an adequate substitute for general purpose [credit] cards. . . . Knowledgeable industry executives agree with these conclusions.

*Id.* at 336-37.

206.   General Purpose Debit Cards are safer than carrying cash and do not require that a consumer plan ahead (*e.g.*, by withdrawing cash from a bank account in order to make purchases).  As Visa and MasterCard have acknowledged, General Purpose Debit Cards also are more widely accepted than checks, making them suitable for transactions at many merchants where checks are not an option. Consumers view General Purpose Debit Cards as superior to cash and checks and,

thus, they likely would not switch to cash and checks in response to a small but significant, non-transitory price increase.  Cash and checks also are not reasonably interchangeable with General Purpose Debit Card Network Services for merchants. As the price of PIN Debit Card acceptance increased from a negative price (*i.e.*, merchants were paid to accept debit because it saved banks' check and cash processing costs) to zero (at-par) to the supracompetitive levels of today, merchants did not substitute away from debit.

207.   Merchant demand exists separately for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.  As noted by the court in the *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003), "[o]verwhelming evidence establishes that merchant demand for credit card [network] services is distinct form merchant demand for debit card network services." *Id.* at *2.  "[D]ebit card [network] services is a well-defined submarket characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole." *Id.* at *7.

## B.   The Geographic Market for All Relevant Product Markets Is the United States

208.   The geographic market for all relevant product markets has been the United States throughout the Damages Period, and that continues to be the case to

this day.  Many of Visa's and MasterCard's rules regarding General Purpose Credit Card and General Purpose Debit Card transactions applied only to the U.S. market. Visa and MasterCard also set policies and pricing — including Interchange Fees — separately for the United States from other regions.  Additionally, U.S. consumers would not find General Purpose Credit Cards or General Purpose Debit Cards issued in other countries — and therefore other currencies — to be adequate substitutes for General Purpose Credit Cards or General Purpose Debit Cards issued by U.S. banks.  Defendants have also demonstrated that small but significant, non-transitory increases in prices limited to these product markets in the United States have been profitable and have not caused merchants to turn to other services sufficiently to make these price increases unprofitable.

## CLAIMS FOR RELIEF

### Count 1:  Against Visa for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Credit Card Network Services (Section 1 of Sherman Act)

209.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

210.   Visa and its member banks' agreement not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

211.   Visa and its member banks have maintained the conspiracy for Visa General Purpose Credit Card transactions throughout the Damages Period.

212.   This conspiracy anticompetitively increased, and maintained, the Interchange Fees that The Home Depot and other merchants paid to Issuers for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions.

213.   The price-fixing conspiracy and agreement not to compete are *per se* unlawful under Section 1 of the Sherman Act.  But even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

214.   The Home Depot suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

215.   As a direct and proximate result of these violations of Section 1 of the Sherman Act throughout the Damages Period, The Home Depot has been injured in its business and property in an amount to be determined at trial.

**Count 2:  Against Visa for Horizontal Price Fixing and**
**Horizontal Agreements Not to Compete in the Market for**
**General Purpose Debit Card Network Services**
**(Section 1 of Sherman Act)**

216.   The Home Depot incorporates by reference each and every allegation

contained in the foregoing paragraphs.

217.   Visa and its member banks' agreement not to compete and price-

fixing schemes constituted anticompetitive horizontal restraints.

218.   Visa and its member banks have maintained the conspiracy for Visa

General Purpose Debit Card transactions throughout the Damages Period.

219.   This conspiracy anticompetitively increased, and maintained, the

Interchange Fees that The Home Depot and other merchants paid to Issuers for

Visa General Purpose Debit Card transactions, and it imposed additional damages

in the form of network fees, fines, and fraud losses.  These price increases were the

products of the agreement among Visa and its owner/member banks that the banks

will not compete for merchants' acceptance of Visa transactions.

220.   The price-fixing conspiracy and agreement not to compete are *per se*

unlawful under Section 1 of the Sherman Act.  Even if analyzed under a rule of

reason, this conspiracy and agreement not to compete were unreasonable restraints

of trade in violation of Section 1.  This scheme served no legitimate business

purpose, and achieved no legitimate efficiency benefit to offset its substantial

anticompetitive effects.

221.   The Home Depot suffered antitrust injury from these *per se* unlawful

and/or unreasonable restraints of trade.

222.   As a direct and proximate result of these violations of Section 1 of the

Sherman Act throughout the Damages Period, The Home Depot has been injured

in its business and property in an amount to be determined at trial.

### Count 3:  Against MasterCard for Horizontal Price-Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Credit Card Network Services (Section 1 of Sherman Act)

223.   The Home Depot incorporates by reference each and every allegation

contained in the foregoing paragraphs.

224.   MasterCard and its member banks' agreement not to compete and

price-fixing schemes constituted anticompetitive horizontal restraints.

225.   MasterCard and its member banks have maintained the conspiracy for

MasterCard General Purpose Credit Card transactions throughout the Damages

Period.

226.   This conspiracy anticompetitively increased, and maintained, the

Interchange Fees that The Home Depot and other merchants paid to Issuers for

MasterCard General Purpose Credit Card transactions, and it imposed additional

damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among MasterCard and its owner/member banks that the banks will not compete for merchants' acceptance of MasterCard transactions.

227.   The price-fixing conspiracy and agreement not to compete are *per se* unlawful under Section 1 of the Sherman Act.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

228.   The Home Depot suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

229.   As a direct and proximate result of these violations of Section 1 of the Sherman Act throughout the Damages Period, The Home Depot has been injured in its business and property in an amount to be determined at trial.

### Count 4:  Against MasterCard for Horizontal Price-Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Debit Card Network Services (Section 1 of Sherman Act)

230.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

1445310.1

231.   MasterCard and its member banks' agreement not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

232.   MasterCard and its member banks have maintained the conspiracy for MasterCard General Purpose Debit Card transactions throughout the Damages Period.

233.   This conspiracy anticompetitively increased, and maintained, the Interchange Fees that The Home Depot and other merchants paid to Issuers for MasterCard General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among MasterCard and its owner/member banks that the banks will not compete for merchants' acceptance of MasterCard transactions.

234.   The price-fixing conspiracy and agreement not to compete are *per se* unlawful under Section 1 of the Sherman Act.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

235.   The Home Depot suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

236.   As a direct and proximate result of these violations of Section 1 of the Sherman Act throughout the Damages Period, The Home Depot has been injured in its business and property in an amount to be determined at trial.

### Count 5:  Against Visa for Vertical Price Restraints in the Market for General Purpose Credit Card Network Services (Section 1 of Sherman Act)

237.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

238.   Visa and its member banks' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

239.   Visa entered into an express vertical agreement with each of the member banks, binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Issuers rules.  In turn, Visa acted as the enforcement agent for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations.  These agreements have continued in full effect throughout the Damages Period.

240.   These vertical price restraints imposed supracompetitive Interchange Fees on The Home Depot and other merchants for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints have continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

241.   The Home Depot suffered antitrust injury from these unreasonable restraints of trade.

242.   As a direct and proximate result of this violation of Section 1 of the Sherman Act, The Home Depot was injured in its business and property in an amount to be determined at trial.

**Count 6:  Against Visa for Vertical Price Restraints in the Market for General Purpose Debit Card Network Services (Section 1 of Sherman Act)**

243.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

244.   Visa and its member banks' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

245.   Visa entered into an express vertical agreement with each of the member banks, binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Issuers rules.  In turn, Visa acted as the enforcement agent for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations.  These agreements have continued in full effect throughout the Damages Period.

246.   These vertical price restraints imposed supracompetitive Interchange Fees on The Home Depot and other merchants for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints have continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

247.   The Home Depot suffered antitrust injury from these unreasonable restraints of trade.

1445310.1

248.   As a direct and proximate result of this violation of Section 1 of the Sherman Act, The Home Depot was injured in its business and property in an amount to be determined at trial.

### Count 7:  Against MasterCard for Vertical Price Restraints in the Market for General Purpose Credit Card Network Services (Section 1 of Sherman Act)

249.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

250.   MasterCard and its member banks' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

251.   MasterCard entered into an express vertical agreement with each of the member banks, binding all of them to comply with the rules and regulations adopted by MasterCard, including the default Interchange Fee and Honor All Issuers rules.  In turn, MasterCard acted as the enforcement agent for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations.  These agreements have continued in full effect throughout the Damages Period.

252.   These vertical price restraints imposed supracompetitive Interchange Fees on The Home Depot and other merchants for MasterCard General Purpose Credit Card transactions, and it imposed additional damages in the form of network

fees, fines, and fraud losses.  These restraints have continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

253.   The Home Depot suffered antitrust injury from these unreasonable restraints of trade.

254.   As a direct and proximate result of this violation of Section 1 of the Sherman Act, The Home Depot was injured in its business and property in an amount to be determined at trial.

**Count 8:  Against MasterCard for Vertical Price Restraints in the Market for General Purpose Debit Card Network Services (Section 1 of Sherman Act)**

255.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

256.   MasterCard and its member banks' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

257.   MasterCard entered into an express vertical agreement with each of the member banks, binding all of them to comply with the rules and regulations adopted by MasterCard, including the default Interchange Fee and Honor All

Issuers rules.  In turn, MasterCard acted as the enforcement agent for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations.  These agreements have continued in full effect throughout the Damages Period.

258.   These vertical price restraints imposed supracompetitive Interchange Fees on The Home Depot and other merchants for MasterCard General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints have continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

259.   The Home Depot suffered antitrust injury from these unreasonable restraints of trade.

260.   As a direct and proximate result of this violation of Section 1 of the Sherman Act, The Home Depot was injured in its business and property in an amount to be determined at trial.

**Count 9:  Against Visa for Monopolization of the Market for
General Purpose Debit Card Network Services
(Section 2 of Sherman Act)**

261.   The Home Depot incorporates by reference each and every allegation

contained in the foregoing paragraphs.

262.   Through the anticompetitive acts set forth above, Visa has unlawfully

acquired monopoly power in the market for General Purpose Debit Card Network

Services.  Visa has taken acts that have the effect of giving it power over price and

the power to exclude competition in the market for General Purpose Debit Card

Network Services.

263.   Through the FANF, Visa has further unlawfully maintained its

monopoly power through anticompetitive conduct that had the purpose and effect

of excluding competition from, and raising the costs of, other providers of General

Purpose Debit Card Network Services.

264.   As a direct and proximate result of Visa's exclusionary conduct,

Interchange Fees and network fees for General Purpose Debit Card Network

Services were set at artificial, supracompetitive levels and The Home Depot

suffered injury to its business and property by paying such artificially-inflated,

supracompetitive Interchange Fees and network fees, in an amount to be

determined at trial.  The Home Depot suffered antitrust injury from these acts of monopolization.

265.   Visa's unlawful acquisition of monopoly power constituted a violation of Section 2 of the Sherman Act.  Visa's unlawful maintenance of monopoly constitutes a violation of Section 2 of the Sherman Act, which is ongoing.

**Count 10:  Against Visa for Attempted Monopolization of the Market for General Purpose Debit Card Network Services (Section 2 of Sherman Act)**

266.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

267.   Visa has taken acts that have the effect of giving Visa power over price and the power to exclude competition in the market for General Purpose Debit Card network Services.

268.   Visa specifically intended to monopolize the market for General Purpose Debit Card Network Services, as evidenced by its specific intent to obtain power over Interchange Fee and network fee pricing for General Purpose Debit Card Network Services, its specific intent to exclude competition in the market for General Purpose Debit Card Network Services, and by its specific intent to take acts with the effects of giving Visa power over price and excluding competition.

269.   To the extent it does not already possess monopoly power, there is a dangerous probability that Visa will obtain monopoly power in the market for General Purpose Debit Card Network Services through the FANF.

270.   As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels and The Home Depot suffered injury to its business and property by paying such artificially-inflated, supracompetitive Interchange Fees.  The Home Depot suffered antitrust injury from these attempted acts of monopolization.

271.   Visa's attempted monopolization constituted and, through the FANF, continues to constitute a violation of Section 2 of the Sherman Act.

### Count 11:  Against Visa for Conspiracy to Monopolize the Market for General Purpose Debit Card Network Services (Section 2 of Sherman Act)

272.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

273.   Visa and its member banks combined and conspired among themselves with the specific intent to monopolize the market for General Purpose Debit Card Network Services.

1445310.1

274.   This conspiracy was successful, as Visa, through the overt acts described above, acquired, enhanced, and maintained monopoly power in the market for General Purpose Debit Card Network Services throughout the Damages Period.

275.   As a direct and proximate result of Visa and its member banks' conspiracy to monopolize, Interchange Fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels, and The Home Depot suffered antitrust injury to its business and property by paying such artificially-inflated, supracompetitive Interchange Fees.

276.   Visa and its member banks' conspiracy to monopolize constituted, and through the FANF continues to constitute, a violation of Section 2 of the Sherman Act.

**Count 12:  Against Visa for Violation of Georgia State Antitrust
and Unfair Competition Laws in the Market for
General Purpose Credit Card Services
(O.C.G.A. Section 13-8-2(a)(2) and
Georgia Constitution Art. 3, Section VI, para. V)**

277.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

278.   Public policy and the law of the State of Georgia, as codified at O.C.G.A. §13-8-2(a)(2) and in the Georgia Constitution, Article 3, Section VI, paragraph V, declares any contract in restraint of trade to be void.

279.   The actions of Visa and its co-conspirator member banks, as previously stated herein, are contracts in restraint of trade and therefore void as a matter of public policy and law.

280.   Visa and each of its co-conspirator member banks knowingly, intentionally and actively participated as distinct business entities in the unlawful contract alleged herein.

281.   The Home Depot has been directly and proximately harmed by the illegal actions of Visa and its co-conspirator member banks in an amount to be determined at trial.

**Count 13:  Against Visa for Violation of Georgia State Antitrust and Unfair Competition Laws in the Market for General Purpose Debit Card Services (O.C.G.A. Section 13-8-2(a)(2) and Georgia Constitution Art. 3, Section VI, para. V)**

282.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

283.   Public policy and the law of the State of Georgia, as codified at O.C.G.A. §13-8-2(a)(2) and in the Georgia Constitution, Article 3, Section VI, paragraph V, declares any contract in restraint of trade to be void.

284.   The actions of Visa and its co-conspirator member banks, as previously stated herein, are contracts in restraint of trade and therefore void as a matter of public policy and law.

285.   Visa and each of its co-conspirator member banks knowingly, intentionally and actively participated as distinct business entities in the unlawful contract alleged herein.

286.   The Home Depot has been directly and proximately harmed by the illegal actions of Visa and its co-conspirator member banks in an amount to be determined at trial.

**Count 14:  Against MasterCard for Violation of Georgia State Antitrust and Unfair Competition Laws in the Market for General Purpose Credit Card Services (O.C.G.A. Section 13-8-2(a)(2) and Georgia Constitution Art. 3, Section VI, para. V)**

287.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

288.   Public policy and the law of the State of Georgia, as codified at O.C.G.A. §13-8-2(a)(2) and in the Georgia Constitution, Article 3, Section VI, paragraph V, declares any contract in restraint of trade to be void.

289.   The actions of MasterCard and its co-conspirator member banks, as previously stated herein, are contracts in restraint of trade and therefore void as a matter of public policy and law.

290.   MasterCard and each of its co-conspirator member banks knowingly, intentionally and actively participated as distinct business entities in the unlawful contract alleged herein.

291.   The Home Depot has been directly and proximately harmed by the illegal actions of MasterCard and its co-conspirator member banks in an amount to be determined at trial.

**Count 15:  Against MasterCard for Violation of Georgia State Antitrust and Unfair Competition Laws in the Market for General Purpose Debit Card Services (O.C.G.A. Section 13-8-2(a)(2) and Georgia Constitution Art. 3, Section VI, para. V)**

292.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

293.   Public policy and the law of the State of Georgia, as codified at O.C.G.A. §13-8-2(a)(2) and in the Georgia Constitution, Article 3, Section VI, paragraph V, declares any contract in restraint of trade to be void.

294.   The actions of MasterCard and its co-conspirator member banks, as previously stated herein, are contracts in restraint of trade and therefore void as a matter of public policy and law.

295.   MasterCard and each of its co-conspirator member banks knowingly, intentionally, and actively participated as distinct business entities in the unlawful contract alleged herein.

296.   The Home Depot has been directly and proximately harmed by the illegal actions of MasterCard and its co-conspirator member banks in an amount to be determined at trial.

**Count 16:  Against Visa for Violation of California State Antitrust and Unfair Competition Laws in the Market for General Purpose Credit Card Services (Cal. Bus. & Prof. Code § 16700 *et seq.*)**

297.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

298.   Visa has market power in the General Purpose Credit Card Network Services market.

299.   Visa and its member banks — direct, horizontal competitors of each other — have engaged in unlawful contracts, combinations and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*).  These unlawful contracts, combinations, and conspiracies were entered into and effectuated within the State of California.

300.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings and concerts of action between and among Visa's member banks and Visa, the substantial terms of which were to illegally fix, raise, maintain or stabilize the Interchange Fees charged to The Home Depot and other merchants by Issuing Banks in the market for General Purpose Credit Card Network Services.

301.   Visa's Board of Directors, which included representatives from several of Visa's member banks, voted to fix, raise, maintain or stabilize the Interchange Fees for Visa transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

302.   All of Visa's member banks have had an actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

1445310.1

303.   As a direct consequence of the contract, combination, conspiracy, and agreement, actual and potential competition in the Credit Card Network Services market was substantially excluded, suppressed and effectively foreclosed.

304.   Visa derived direct and substantial economic benefits from the supracompetitive Interchange Fees in the General Purpose Credit Card Network Services market.

305.   But for the anticompetitive conduct of Visa and its member banks, competition among banks would have eliminated or greatly reduced the credit card Interchange Fees in order to gain business from merchants, including The Home Depot.

306.   The collectively-fixed credit card Interchange Fee is illegal.  It is not necessary to accomplish any procompetitive benefit to the Visa network.  Visa and its member banks' price fixing achieved few, if any, procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General Purpose Credit Card Network Services market.  Even if some horizontal agreement was necessary to promote the efficiencies of the Visa network, the collectively-set credit card Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.

307.   As a direct and proximate consequence of Visa's anticompetitive

conduct, The Home Depot suffered injury in its business and property, in an

amount to be determined at trial, by having to pay such artificially inflated,

supracompetitive Interchange Fees for General Purpose Credit Card Network

Services.  The Home Depot's injury is the type of injury the Cartwright Act and

the other antitrust laws were designed to prevent and flows from that which makes

Visa's and its member banks' conduct unlawful.

### Count 17:  Against Visa for Violation of California State Antitrust and Unfair Competition Laws in the Market for General Purpose Debit Card Services (Cal. Bus. & Prof. Code § 16700 *et seq.*)

308.   The Home Depot incorporates by reference each and every allegation

contained in the foregoing paragraphs.

309.   Visa has market power in the General Purpose Debit Card Network

Services markets.

310.   Visa and its member banks — direct, horizontal competitors of each

other — have engaged in unlawful contracts, combinations and conspiracies in an

unreasonable restraint of interstate trade or commerce in violation of § 16700 *et*

*seq.* of the Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*).  These

unlawful contracts, combinations, and conspiracies were entered into and

effectuated within the State of California.

1445310.1

311.   The unlawful contracts, combinations and conspiracies consisted of continuing agreements, understandings and concerts of action between and among Visa's member banks and Visa, the substantial terms of which were to illegally fix, raise, maintain or stabilize the Interchange Fees charged to The Home Depot and other merchants by Issuing Banks in the markets for General Purpose Debit Card Network Services.

312.   Visa's Board of Directors, which included representatives from several of Visa's member banks, voted to fix, raise, maintain or stabilize the Interchange Fees for Visa transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

313.   All of Visa's member banks have had an actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

314.   As a direct consequence of the contract, combination, conspiracy and agreement, actual and potential competition in the General Purpose Debit Card Network Services markets was substantially excluded, suppressed and effectively foreclosed.

315.   Visa derived direct and substantial economic benefits from the supracompetitive Interchange Fees in the General Purpose Debit Card Network Services markets.

316.   But for the anticompetitive conduct of Visa and its member banks, competition among banks would have eliminated or greatly reduced the debit card Interchange Fees in order to gain business from merchants, including The Home Depot.

317.   The collectively-fixed debit card Interchange Fee is illegal.  It is not necessary to accomplish any procompetitive benefit to the Visa network.  Visa and its member banks' price fixing achieved few, if any, procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General Purpose Debit Card Network Services market.  Even if some horizontal agreement was necessary to promote the efficiencies of the Visa network, the collectively-set debit card Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.

318.   As a direct and proximate consequence of Visa's anticompetitive conduct, The Home Depot suffered injury in its business and property, in an amount to be determined at trial, by having to pay such artificially inflated, supracompetitive Interchange Fees for General Purpose Debit Card Network Services.  The Home Depot's injury is the type of injury the Cartwright Act and the other antitrust laws were designed to prevent and flows from that which makes Visa's and its member banks' conduct unlawful.

**Count 18:  Against MasterCard for Violation of California State
Antitrust and Unfair Competition Laws in the Market
for General Purpose Credit Card Services
(Cal. Bus. & Prof. Code § 16700 *et seq.*)**

319.   The Home Depot incorporates by reference each and every allegation

contained in the foregoing paragraphs.

320.   MasterCard has market power in the General Purpose Credit Card

Network Services market.

321.   MasterCard and its member banks — direct, horizontal competitors of

each other — have engaged in unlawful contracts, combinations and conspiracies

in an unreasonable restraint of interstate trade or commerce in violation of § 16700

*et seq.* of the Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*).  These

unlawful contracts, combinations and conspiracies were entered into and

effectuated within the State of California.

322.   The unlawful contracts, combinations, and conspiracies consisted of

continuing agreements, understandings and concerts of action between and among

MasterCard's member banks and MasterCard, the substantial terms of which were

to illegally fix, raise, maintain or stabilize the Interchange Fees charged to The

Home Depot and other merchants by Issuing Banks in the market for General

Purpose Credit Card Network Services.

323.   MasterCard's Board of Directors, which included representatives from several of MasterCard's member banks, voted to fix, raise, maintain or stabilize the Interchange Fees for MasterCard transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

324.   All of MasterCard's member banks have had an actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

325.   As a direct consequence of the contract, combination, conspiracy and agreement, actual and potential competition in the General Purpose Credit Card Network Services market was substantially excluded, suppressed and effectively foreclosed.

326.   MasterCard derived direct and substantial economic benefits from the supracompetitive Interchange Fees in the General Purpose Credit Card Network Services market.

327.   But for the anticompetitive conduct of MasterCard and its member banks, competition among banks would have eliminated or greatly reduced the credit card Interchange Fees in order to gain business from merchants, including The Home Depot.

328.   The collectively-fixed credit card Interchange Fee is illegal.  It is not necessary to accomplish any procompetitive benefit to the MasterCard network.

MasterCard and its member banks' price fixing achieved few, if any, procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General Purpose Credit Card Network Services market.  Even if some horizontal agreement was necessary to promote the efficiencies of the MasterCard network, the collectively-set credit card Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.

329.   As a direct and proximate consequence of MasterCard's anticompetitive conduct, The Home Depot suffered injury in its business and property, in an amount to be determined at trial, by having to pay such artificially inflated, supracompetitive Interchange Fees for General Purpose Credit Card Network Services.  The Home Depot's injury is the type of injury the Cartwright Act and the other antitrust laws were designed to prevent and flows from that which makes MasterCard's and its member banks' conduct unlawful.

**Count 19:  Against MasterCard for Violation of California State Antitrust and Unfair Competition Laws in the Market for General Purpose Debit Card Services (Cal. Bus. & Prof. Code § 16700 *et seq.*)**

330.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

331.   MasterCard has market power in the General Purpose Debit Card Network Services market.

332.   MasterCard and its member banks — direct, horizontal competitors of each other — have engaged in unlawful contracts, combinations and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*).  These unlawful contracts, combinations and conspiracies were entered into and effectuated within the State of California.

333.   The unlawful contracts, combinations and conspiracies consisted of continuing agreements, understandings and concerts of action between and among MasterCard's member banks and MasterCard, the substantial terms of which were to illegally fix, raise, maintain or stabilize the Interchange Fees charged to The Home Depot and other merchants by Issuing Banks in the market for General Purpose Debit Card Network Services.

334.   MasterCard's Board of Directors, which included representatives from several of MasterCard's member banks, voted to fix, raise, maintain or stabilize the Interchange Fees for MasterCard transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

335.   All of MasterCard's member banks have had an actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

1445310.1

336.   As a direct consequence of the contract, combination, conspiracy and agreement, actual and potential competition in the General Purpose Debit Card Network Services market was substantially excluded, suppressed and effectively foreclosed.

337.   MasterCard derived direct and substantial economic benefits from the supracompetitive Interchange Fees in the General Purpose Debit Card Network Services market.

338.   But for the anticompetitive conduct of MasterCard and its member banks, competition among banks would have eliminated or greatly reduced the debit card Interchange Fees in order to gain business from merchants, including The Home Depot.

339.   The collectively-fixed debit card Interchange Fee is illegal.  It is not necessary to accomplish any procompetitive benefit to the MasterCard network. MasterCard and its member banks' price fixing achieved few, if any, procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General Purpose Debit Card Network Services market.  Even if some horizontal agreement was necessary to promote the efficiencies of the MasterCard network, the collectively-set debit card Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.

340.   As a direct and proximate consequence of MasterCard's anticompetitive conduct, The Home Depot suffered injury in its business and property, in an amount to be determined at trial, by having to pay such artificially inflated, supracompetitive Interchange Fees for General Purpose Debit Card Network Services.  The Home Depot's injury is the type of injury the Cartwright Act and the other antitrust laws were designed to prevent and flows from that which makes MasterCard's and its member banks' conduct unlawful.

### Count 20:  Against Visa and MasterCard for Violation of State Antitrust and Unfair Competition Laws

341.   The Home Depot incorporates by reference each and every allegation contained in the foregoing paragraphs.

342.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Alabama Code § 8-10-1 *et seq.*

343.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Arizona Revised Stat. § 44-1401 *et seq.*

344.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of District of Columbia Code § 28-4501 *et seq.*

345.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Florida Stat. Ann. § 501.201 *et seq.*

346.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Hawaii Rev. Stat. § 480-1 *et seq.*

347.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of 740 Illinois Comp. Stat. Ann. § 10/1 *et seq.*

348.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Iowa Code Ann. § 553.1 *et seq.*

349.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Kansas Stat. Ann. § 50-101 *et seq.*

350.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Maine Rev. Stat. Ann. tit. 10, § 1101 *et seq.*

351.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Michigan Comp. Laws Ann. § 445.771 *et seq.*

352.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Minnesota Stat. § 325D.49 *et seq.*

353.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Mississippi Code Ann. § 75-21-1 *et seq.*

354.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nebraska Rev. Stat. § 59-801 *et seq.*

355.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nevada Rev. Stat. § 598A.010 *et seq.*

356.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New Mexico Stat. Ann. § 57-1-1 *et seq.*

357.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New York General Business Law § 340 *et seq*. and § 369-A.

358.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Carolina Gen. Stat. § 75-1 *et seq*.

359.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Dakota Cent. Code § 51-08.1-01 *et seq*.

360.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Oregon Rev. Stat. § 646.705 *et seq*.

361.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Rhode Island Gen. Laws § 6-36-1 *et seq*.

362.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of South Dakota Codified Laws Ann. § 37-1-3.1 *et seq*.

1445310.1

363.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Tennessee Code Ann. § 47-25-101 *et seq*.

364.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Vermont Stat. Ann. tit. 9, § 2451 *et seq*.

365.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Wisconsin Stat. § 133.01 *et seq*.

366.   As a direct and proximate result of Defendants' unlawful conduct, The Home Depot suffered injury to its business and property in each of these states by paying such artificially-inflated, supracompetitive Interchange Fees for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

## **PRAYER FOR RELIEF**

WHEREFORE, The Home Depot prays for a judgment in its favor and against Defendants and for the following relief:

A. That the Court declare, adjudge and decree that Defendants have committed the violations of federal and state laws alleged herein;

B.  That the Court award damages sustained by The Home Depot because of Defendants' misconduct, in an amount to be proved at trial, to be trebled in accordance with antitrust law, plus interest, including prejudgment interest, attorneys' fees and costs of suit;

C.  That the Court enjoin Visa's FANF; and

D.  That the Court order such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

The Home Depot hereby demands a trial by jury of all issues properly triable thereby.

1445310.1

DATED:  Atlanta, Georgia
           June 13, 2016

Respectfully submitted,

*/s/ Frank M. Lowrey IV*
Frank M. Lowrey IV
Georgia Bar No. 410310
lowrey@bmelaw.com
Ronan P. Doherty
Georgia Bar No. 224885
doherty@bmelaw.com

**BONDURANT MIXSON &**
    **ELMORE, LLP**
3900 One Atlantic Center
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel. (404) 881-4100
Fax (404) 881-4111

*Of Counsel:*
Stephen R. Neuwirth*
stephenneuwirth@quinnemanuel.com
Steig D. Olson*
steigolson@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor,
New York, New York  10010
Tel. (212) 849-7000

Alicia K. Cobb*
aliciacobb@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
600 University Street, Suite 2800
Seattle, Washington 98101
Tel. (206) 905-7000

(*Pro Hac Vice Applications to be filed)

    *Attorneys for Plaintiffs The Home Depot, Inc. and Home Depot U.S.A., Inc.*

1445310.1